**Martin J. ROESS, Plaintiff,**

**v.**

**ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Defendant.**

**No. 72–679–Civ–T–H.**

United States District Court,
M. D. Florida,
Tampa Division.

Nov. 8, 1974.

Thomas C. MacDonald, Jr., and Robert R. Vawter, Jr., of Shackleford, Farrior, Stallings & Evans, P. A., Tampa, Fla., for plaintiff.

W. Donald Cox of Fowler, White, Gillen, Boggs, Villareal & Banker, P. A., Tampa, Fla., for defendant.

## ORDER

HODGES, District Judge.

This is an action for breach of contract, jury trial demanded. Plaintiff Roess, as the insured, sues the Defendant under a contract of insurance claiming that he has suffered a loss within the purview of the policy and that the Defendant has breached its contract by refusing to pay. Defendant (St. Paul Fire) has consistently denied that the claim was within the coverage afforded by the policy.

A regularly scheduled pre-trial conference was conducted on May 21, 1974. Upon consideration of the pre-trial stipulation and the oral argument of counsel, it became apparent that the dominant issue in the case (coverage of the policy) should be resolved as a matter of law on the basis of certain fundamental, undisputed facts. The Court thus entered an order postponing the trial and directing the filing of briefs. A concise chronology of events will place the issue in proper perspective.

On November 22, 1967, a civil action was instituted in the state court of Pinellas County, Florida, by one Hubert Caulfield, as plaintiff, against Vlastimil Koubek and others as defendants. The action was filed by Caulfield in his capacity as a taxpayer, and the complaint generally challenged the legality of a proposed construction project in the City of St. Petersburg known as the Bayfront Plaza. Koubek was one of the developers of the proposed project pursuant to certain arrangements with the City.

On April 26, 1968, a final judgment was entered in the above case (the taxpayer's action). The judgment was adverse to the plaintiff Caulfield and in favor of defendant Koubek on the merits of the claim. However, the court also denied a motion made by Koubek to enjoin the institution of any further suits

of like nature by plaintiff Caulfield or members of his taxpayers' class.

On May 3, 1968, the Defendant in this action, St. Paul Fire, issued the disputed policy of insurance to the Plaintiff, Martin J. Roess, entitled "Top Brass Personal Catastrophe Policy." Among other risks, the policy indemnified against liabilities due to "personal injuries" caused by the insured, including, by definition, "malicious prosecution."[1]

On May 8, 1968, Koubek filed an appeal to the Supreme Court of Florida from that portion of the state court's judgment denying injunctive relief against the filing of similar actions by Caulfield or members of his taxpayers' class; and on June 24, 1968, plaintiff Caulfield cross-appealed from the judgment on the merits.

On July 24, 1968, the Supreme Court of Florida entered its order and decision affirming the judgment of the state ·trial court in the taxpayer's action; and subsequently, on August 19, 1968, the Court denied a petition for rehearing. Koubek v. Caulfield, 213 So.2d 417 (Fla.1968).

On October 2, 1970, an amended complaint was filed in this Court in the case of Koubek v. Caulfield and Roess (Case No. 69–496–Civ.–T–K, assigned to Judge Krentzman). The suit was an action for malicious prosecution brought by Koubek against Roess alleging that Roess had financed the taxpayer's action in state court and had caused it to be maintained "knowing it to be frivolous and without probable cause and desiring to destroy [Koubek's] business venture in Bayfront Plaza . . . " Roess notified St. Paul Fire of the filing of the suit and demanded that the carrier assume his defense. The demand was rejected on the ground that the policy afforded no coverage with respect to Koubek's claim. Roess ultimately settled with Koubek by paying the sum of $67,500.00. He then initiated this action seeking to recover that payment from St. Paul Fire under his insurance policy.

Given these facts, the Court's pre-trial order of May 24, 1974, directed the submission of briefs concerning the following issues: (a) whether the policy afforded coverage with respect to the malicious prosecution claim asserted against Roess by Koubek; (b) since the policy was issued while the taxpayers' suit was in progress, if the policy afforded coverage, whether the insurer can limit its liability to damages accruing to Koubek after the policy was issued, or whether coverage extends to all damages incurred by Koubek by reason of the taxpayers' suit; and (c) whether the Plaintiff was obligated to inform the Defendant insurer of the pendency of the taxpayers' suit at the time the policy was issued, when the policy application did not solicit such information.

## A. THE COVERAGE QUESTION

Simply stated, the specific dispute here is whether the operative occurrence triggering Roess' liability to Koubek transpired before or after the effective date of the policy. Plaintiff says it occurred after the issuance of the policy, while Defendant contends it occurred before. It will be remembered that the taxpayers' suit (the maliciously prosecuted action) was commenced and, indeed, was determined by judgment in the trial court prior to issuance of the policy, but was not ultimately terminated on appeal (by the Supreme Court of Florida) until after the date of issuance.

Both parties agree that, under Florida law, favorable termination of a maliciously prosecuted action is an essential element of the injured party's claim in tort.

> "It is well established in Florida that an action for malicious prosecution lies where the following elements concur:
>
> (1) the commencement or continuance of an original civil or criminal judicial proceeding;
>
> (2) its legal causation by the present defendant against the plaintiff;

---

1. The policy was issued pursuant to an application which did not solicit any information concerning pending litigation in which the insured might be involved.

(3) its bona fide termination in favor of the plaintiff;

(4) the absence of probable cause for such prosecution;

(5) the presence of malice; and

(6) damage conforming to legal standards resulting to plaintiff."

(Liabos v. Harman, 215 So.2d 487, 488 (Fla.App.2d Dist.1968.)

Plaintiff's position, therefore, is quite simple. He says that Koubek's claim against him did not mature or accrue as a matter of law until the taxpayer's action was terminated in Koubek's favor by the Supreme Court of Florida, and that this event occurred after the issuance of the policy. Defendant counters, however, with two distinct arguments.

The first contention advanced by Defendant is derived entirely from the decision in Muller Fuel Oil Co. v. Insurance Company of North America, 95 N.J.Super. 564, 232 A.2d 168 (1967); and, to be sure, that is the only decision in point cited by either counsel. In that instance the insured initiated a criminal charge against one Thomas Policastro. The disputed insurance was obtained during the pendency of the criminal proceeding. Policastro was then acquitted, subsequent to the issuance of the policy; and, upon his acquittal, promptly sued the insured for malicious prosecution. Treating the issue as one of first impression, the New Jersey Court held that the policy afforded no coverage under those facts. The Court reasoned that the "essence" of the tort of malicious prosecution in New Jersey is the wrongful conduct of filing a criminal complaint with malice and without probable cause; and it referred to the necessity of termination in favor of the victim as in the nature of a "condition precedent" to suit rather than an essential element of the tort itself. The Court also stressed the fact that the victim suffers damage immediately upon arrest pursuant to a baseless *criminal* charge, and it utilized that point to distinguish the general rule in negligence cases that the tort is not consummated until damage occurs (even though the negligence antedates the injury by months or years). Finally, the Court said (232 A.2d at 175):

"It would be unreasonable to hold under those circumstances, and without more, that the insurance company intended to insure against a malicious prosecution suit, instituted subsequent to issuance of the policy, when four of the five essential ingredients of such an action preceded purchase of the policy—and those four constituted the 'essence' of the tort. To hold that coverage existed in such a case would mean that such a tortfeasor could purchase coverage a day before the injured person was acquitted in the criminal proceeding and thus shift the burden of damages to an unwary insurance company."

The only real basis upon which the *Muller Fuel Oil* decision might be distinguished from the case *sub judice* is the fact that *Muller* involved a malicious criminal prosecution whereas this case involves a maliciously prosecuted civil action. In a criminal case the principal act of a tortious nature is the filing of the charge or issuance of a warrant. The state thereafter controls the prosecution, not the accuser. Thus, as the New Jersey court noted, the "essence" of the tort in those circumstances is the initiation of the charge; and the victim's principal damage is usually suffered at that moment, i. e., upon arrest and the resulting stigma that attaches to one accused of crime. In a civil action, however, the malicious plaintiff remains in control of the prosecution of the suit, and the principal damage to the victim may or may not coincide with the filing of the case. The "essence" of the tort, in other words, may well be the continued prosecution of the claim rather than its mere initiation. While this difference clearly undermines the rationale of *Muller* as applied to the facts of this case, it must be recognized as a dubious point of distinction vis-a-vis the contractual relationship between the tortfeasor and his insurance carrier. Logically, as

between those parties, it should make no difference as to the coverage afforded by the policy that the malicious prosecution was a criminal case rather than civil or *vice versa*. By the same token, however, the fact that the *Muller* rationale loses much of its force when applied in the setting of a maliciously prosecuted *civil* action suggests that the correctness of the decision is subject to question; and it is the view of this Court that the *Muller* rule would not be embraced by the Courts of Florida. Favorable termination of the maliciously prosecuted action is an essential element of the victim's claim in tort, and the cause of action does not mature or accrue until that element has been accomplished. There is nothing in the Florida cases to indicate that one element is the "essence" of the tort, or might otherwise be regarded as more important than another element; and neither is there any suggestion that favorable termination might be treated as a mere condition precedent to filing suit rather than an indispensable ingredient of the claim itself.

Nor is this Court persuaded by that portion of the *Muller* decision (quoted *supra*) indicating that public policy will not tolerate the purchase of insurance coverage "a day before the injured person [is] acquitted in the criminal proceeding and thus shift the burden of damages to an unwary insurance company." If one assumes that insurance against liability for commission of an intentional tort is not *per se* violative of public policy (and no such contention was made in *Muller* or here), then the timing of the purchase of the coverage by the tortfeasor is necessarily irrelevant. One might deliberately secure a policy far in advance of an intended malicious prosecution as easily as the day before the occurrence of the final or consummating element of the tort. Indeed, from the standpoint of public policy, the former circumstance would be more premeditated and, to that extent, more reprehensible than the latter. Moreover, in the latter situation, it hardly seems apt to refer to the insurance company as "unwary". One simple question on its application form (concerning pending litigation) would serve to protect its position.

■ It is the conclusion of the Court, therefore, that a cause of action for the tort of malicious prosecution in Florida does not arise, mature or accrue until all of the essential elements of the tort have materialized, including favorable termination of the malicious action in favor of the victim. Thus, in the context of this case, the date of favorable termination (rather that commencement) of the malicious action against Koubek was the operative occurrence upon which the effectiveness of the policy stands or falls.

This conclusion, however, does not dispose of the issue because of Defendant's second or alternative contention, namely, that the taxpayer's action against Koubek was favorably terminated (and the tort thus consummated) upon the entry of judgment in the state trial court on April 26, prior to the issuance of the policy to Roess on May 3. Authority is cited for the proposition that the right to maintain an action for malicious prosecution accrues upon the rendition of judgment in the trial court whether an appeal is taken or not. It appears, however, that the weight of authority is to the contrary (Annot., 41 A.L.R.2d 863 (1955)); and there is no reason to believe that the Florida courts would adopt a minority view.

■ In summary, then, the Court is compelled to the result as a matter of law that the Koubek claim against Roess for malicious prosecution did not mature until the taxpayer's action was finally terminated in the Supreme Court of Florida on August 19, 1968, within the operative term of the policy previously issued on May 3, 1968. Koubek's claim, therefore, was within the coverage afforded to Roess by the policy.

## B. EXTENT OF COVERAGE

■ The second issue is whether, on the facts of this case, St. Paul Fire can

limit the coverage of the policy to those damages suffered by Koubek (the victim of the insured's tort) after the effective date of the policy where, admittedly, certain elements of the tort and perhaps certain items of damage occurred before the policy was issued. So stated, however, the question itself tends to supply the answer. If the operative event triggering liability occurs within the policy period so that coverage is found to exist, then absent an explicit provision in the policy to the contrary (and there is none), such "coverage" must extend to all sums for which the insured is liable up to the limits of the policy.[2] As analogous authority, Roess points to those decisions in the field of workman's compensation insurance uniformly holding that the carrier is liable to the employee for occupational diseases culminating during the policy period although the causes of the condition occurred before the policy became effective. See, Falk Corporation v. Industrial Commission, 202 Wis. 284, 232 N.W. 542, 543 (1930); Couch, Insurance 2d, Vol. 9, § 39:118 (1962). In the absence of persuasive authority to the contrary, therefore, the Court concludes that the insurance extends to all damages for which the insured was liable even though some items of the victim's damage may have been incurred prior to the issuance of the policy.

## C. THE NON-DISCLOSURE ISSUE

Florida Statute § 627.409 (1973) provides in pertinent part as follows:

"627.409 Representations in applications; warranties

"(1) All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a re-

covery under the policy or contract unless either:

(a) Fraudulent; or

(b) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(c) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise."

To the extent that this statute is in derogation of the common law, its primary significance lies in the fact that it allows avoidance of the policy by the insurer even though a misstatement of material fact is made by the insured on an application form in good faith and without knowledge of the falsity of the representation. See Life Insurance Co. of Virginia v. Shifflet, 201 So.2d 715 (Fla.1967). In that respect, however, the statute clearly relates by its express terms only to misrepresentation or concealment "in any application . . . or in negotiations . . . ." (Subsection (1)); or "as required either by the application for the policy or contract or otherwise." (Subsection (1)(c)). Stated another way, the statute simply does not apply to concealment or other species of fraud not related to questions asked or representations made either on an application form or during the course of other special negotiations preceding issuance of the policy. In the circumstances of this case, therefore, since the subject of pending litigation was not broached in the application form nor otherwise discussed in any separate negotiations, one must look beyond the statute to the common law in order to

---

2. The primary liability of the carrier, after all, is to its insured, not the victim of the tort.

determine the rights and obligations of the parties.

■ The modern rule seems to be that the insurer has a duty to make inquiry concerning matters deemed by it to be material to the risk, and the insured is entitled to a presumption that information not requested is deemed immaterial. Thus, where no inquiry is made about matters alleged to have been concealed, the insurer may avoid the policy only by proving that the concealment was in fact material and, further, that the withholding of such information was intentional and fraudulent. Couch, Insurance 2d, Vol. 9, § 38:72; 18 Fla.Jur., Insurance, §§ 572 and 577. See also, and compare, American Ins. Co. v. Robinson, 120 Fla. 674, 163 So. 17 (1935) and Massachusetts Bonding & Ins. Co. v. Hoxie, 129 Fla. 332, 176 So. 480 (1937).

In summary, therefore, the non-disclosure by Roess of the pendency of the taxpayer's suit at the time the policy was issued was not a "concealment" within the meaning of Florida Statute § 627.409 since no inquiry was made of him concerning that subject matter. On the other hand, if the insurer could allege and prove that the pendency of the suit was material to the risk from an underwriting standpoint (overcoming the adverse presumption arising from the lack of inquiry) ; and could further prove that the nondisclosure of such fact was an intentional and fraudulent concealment by Roess, it would then be entitled to relief under the traditional common law rule. Cf., National Life Ins. Company v. Harriott, 268 So.2d 397 (Fla.App.2d Dist.1972).

■ This conclusion, however, gives rise to an additional question in this case. St. Paul Fire alleged in its answer, as an Eighth Defense, merely that the pendency of the taxpayer's suit was not disclosed and that such fact was material to the risk, i. e., a defense predicated upon Florida Statute § 627.409, although the statute was not specifically cited. Moreover, the pre-trial stipulation did not enlarge upon this defense by setting up a claim of intentional and fraudulent concealment. In its legal memorandum, however, the Defendant asserts with respect to this issue that it does, indeed, claim fraud on the part of its insured. Roess responds, of course, that this assertion comes too late since it was not made in the answer or the pre-trial stipulation. Nevertheless, given the procedural development of this case in terms of the manner in which the issues have been crystalized and in part resolved by the Court in this order, it is the view of the Court that the Defendant should be given an opportunity to amend its answer, if it so desires, to specifically allege an intentional and fraudulent concealment of material fact. See National Life Ins. Company v. Harriott, *supra.*

The Defendant shall have fifteen (15) days from the date hereof to file and serve an amendment to its answer if it chooses to do so. If such an amendment is filed, the issues remaining for trial will be (a) whether the Plaintiff was guilty of an intentional fraudulent concealment of material fact rendering the policy voidable at the election of the Defendant; and (b) if not, whether the amount paid by Plaintiff to Koubek in settlement of the malicious prosecution claim was reasonable. If such an amendment is not filed, of course, the latter issue will be the sole issue remaining for trial. In all other respects, Plaintiff is entitled to, and is hereby granted, partial summary judgment as a matter of law pursuant to Rule 56, F.R Civ.P.

It is so ordered.