SECURITY MUTUAL CASUALTY COMPANY, Plaintiff-Appellant, *v.* HARBOR INSURANCE COMPANY *et al.*, Defendants-Appellees.

First District (1st Division)   No. 63059

Opinion filed September 11, 1978.—Rehearing denied October 30, 1978.

A. Denison Weaver, of Chicago, for appellant.

Pretzel, Stouffer, Nolan & Rooney, of Chicago (Joseph B. Lederleitner, of counsel), for appellee Harbor Insurance Company.

Donald M. Haskell and Daniel J. Pope, both of Chicago (Haskell & Perrin, of counsel), for appellee Continental Casualty Company.

Epton & Druth, Ltd., of Chicago, for appellee Consolidated Mutual Insurance Company.

Baker & McKenzie, of Chicago, for appellee Insurance Company of North America.

Lord, Bissell & Brook, of Chicago (Thomas W. Dempsey and Hugh C. Griffin, of counsel), for appellees Underwriters at Lloyd's London.

Mr. JUSTICE BUCKLEY delivered the opinion of the court:

This is an appeal of an order compelling arbitration under a declaratory judgment action filed by Security Mutual Casualty Company (hereafter Security) to establish its rights and duties under its policy insuring Harbor Insurance Company (hereafter Harbor). Security alleges error in the circuit court of Cook County's issuance of such an order without first determining whether the matter to be arbitrated is within the terms of the parties' arbitration agreement.

■■ Although Harbor has not contested this court's jurisdiction to entertain the appeal of the order to arbitrate, we note that an order to

compel or stay arbitration has been determined to be equivalent to an order granting or refusing injunctive relief (*Medline Industries, Inc. v. Pascal* (1975), 23 Ill. App. 3d 346, 319 N.E.2d 310; *Property Management, Ltd. v. Howasa, Inc.* (1973), 14 Ill. App. 3d 536, 302 N.E.2d 754; *School District 46 v. Del Bianco* (1966), 68 Ill. App. 2d 145, 215 N.E.2d 25), and is appealable pursuant to Supreme Court Rule 307(a)(1) (58 Ill. 2d R. 307(a)(1)).

On September 9, 1960, Security entered into a reinsurance treaty in Chicago, Illinois, with Harbor, designated "Reinsurance Agreement No. 308071." Under the treaty, Security undertook to reinsure Harbor on certain classes of risks in the amount of $1,975,000 in excess of $25,000, the latter amount being retained by Harbor. Security agreed to provide reinsurance coverage for those risks insured by Harbor with respect to the following exposure:

> "Third Party Bodily Injury Liability (including medical payments) and Property Damage Liability Business; Workmens Compensation and Employers' Liability Business; Motor Cargo Business."

The treaty likewise contained an arbitration clause in article XIII:

> "In the event of any dispute between the Company and the Reinsurer in connection with this Agreement, such dispute shall be submitted to arbitration."

The policy of reinsurance remained in effect until January 1, 1965, when it was terminated by the mutual consent of Security and Harbor.

Sometime prior to August 1963, John Bertero was employed as President of National General Corporation (hereafter National), the primary assured under insurance policy No. 5—1585 issued by Harbor to National.

At the request of the Board of Directors of National, John Bertero resigned as president effective November 12, 1959. Thereafter a dispute arose between Bertero and National. On June 8, 1962, suit was filed in Los Angeles Superior Court by Bertero against National seeking a declaratory judgment with respect to the validity of his employment contract with National. On August 28, 1963, National filed a counterclaim in the suit alleging in part that Bertero had obtained the contract through duress, undue influence and for no consideration.

On October 1, 1963, National amended its previously filed answer to include a cross-complaint for money had and received. National's cross-complaint later became the basis of a malicious prosecution action by Bertero.

In August of 1965, eight months after Security's policy of reinsurance with Harbor had been terminated, a jury verdict was returned and judgment entered in favor of Bertero in the amount of $500,000. The

cross-complaint filed against him by National was dismissed. The judgment was affirmed on appeal on September 6, 1967 (*Bertero v. National General Corp.* (1967), 254 Cal. App. 2d 126, 62 Cal. Rptr. 714), and became final December 5, 1967.

In March 1968, after the original judgment had become final, Bertero filed suit in the Los Angeles Superior Court against National, alleging that National was guilty of malicious prosecution in filing its cross-complaint in the former suit.

National, upon being served with summons, tendered the defense to the defendant, Continental Casualty Company, the primary insurer of National at the time the original cross-complaint was filed. Continental accepted the defense and proceeded to retain counsel on behalf of National who proceeded with the defense in the malicious prosecution action.

On May 5, 1971, a judgment was recovered by Bertero against National in the amount of $1,178,952.77. On December 20, 1974, the trial court's judgment was affirmed by the California Supreme Court (*Bertero v. National General Corp.* (1974), 13 Cal. 3d 45, 529 P.2d 608, 118 Cal. Rptr. 184). On February 4, 1975, the judgment was satisfied by means of a draft issued by Harbor in the amount of $1,444,234.83 and $19,829.18 paid by Continental Casualty Company, the primary carrier.

During this time period, the schedule of insurance on National involved various companies. From September 25, 1961, Harbor had in force its Policy No. 5—1585 providing excess combined single limit general liability coverage in the amount of $1,900,000 in excess of $100,000 which coverage remained in force from September 25, 1961, to September 25, 1963, and thereafter in the amount of $1,900,000 in excess of $10,000 from September 25, 1963, to September 25, 1964. The primary coverage was provided by Continental Casualty Company.

From September 25, 1964, to November 15, 1967, Harbor had in force its Policy No. 102298 furnishing excess comprehensive liability coverage to National. This policy was excess insurance over a policy issued by the defendant, Consolidated Mutual Insurance Company, which provided comprehensive general liability coverage to National in the amount of $25,000. During this period, Harbor was reinsured by the defendant, Certain Underwriters at Lloyd's.

From November 15, 1967, to November 15, 1970, Harbor had in force its Policy No. 105236 furnishing excess comprehensive liability coverage, which policy was in excess to a primary "Blanket Liability and Automobile Policy No. LAB 1 92 40" issued by the defendant, Insurance Company of North America, in the amount of $50,000. Harbor, in turn, reinsured its excess policy for all sums in excess of $35,000 through yet another insurance company.

Following Harbor's payment of the California judgment in favor of Bertero against National, Harbor made a demand on plaintiff, Security, to be reimbursed in the amount of $1,414,036.95. The amount represented the judgment, accrued interest and costs, less $10,000 paid by Continental Casualty Company under its primary policy and the $25,000 retained by Harbor under its excess policy provided by the reinsurance agreement issued by Security that was in force from January 1, 1960, to January 1, 1965. Security refused the demand.

Security received a letter on behalf of Harbor on March 17, 1975, demanding arbitration. On April 11, 1975, Security filed a declaratory judgment action seeking a declaration of its rights and obligations under the reinsurance treaty issued by Security to Harbor.

Security named as defendants, in addition to Harbor, Continental Casualty Company, Consolidated Mutual Insurance Company, Insurance Company of North America, and Certain Underwriters at Lloyd's, in that their rights and liabilities under their respective policies would be affected by the resolution of the dispute between Security and Harbor.

On the same day, pursuant to section 2 of the Uniform Arbitration Act (Ill. Rev. Stat. 1975, ch. 10, par. 102), Security filed a petition seeking a stay of arbitration. On May 16, 1975, Harbor filed its motion to strike Security's petition to stay arbitration and, alternatively, filed a cross-motion to compel arbitration. Following the filing of memoranda by the respective parties, the court after oral argument entered an interlocutory order on September 3, 1975. The order denied plaintiff Security's petition to stay arbitration while granting defendant Harbor's alternative petition to compel arbitration. At the same time, the court denied defendant Harbor's motion to strike and dismiss the complaint for declaratory judgment and stayed all further proceedings in that matter pending the arbitration award or decision. Security appeals from the order denying its petition to stay arbitration.

The sole issue presented by this appeal is whether it was error for the circuit court to order arbitration without first determining whether the dispute at hand was arbitrable. Section 2 of the Uniform Arbitration Act provides:

> "On application, the court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate. That issue, when in substantial and bona fide dispute, shall be forthwith and summarily tried and the stay ordered if found for the moving party. If found for the opposing party, the court shall order the parties to proceed to arbitration." Ill. Rev. Stat. 1975, ch. 10, par. 102(b).

■■■ The Arbitration Act's language on its face frames the issue before a circuit court as being merely whether any agreement to arbitrate exists,

and it presupposes that summary determination will take place. In practice, however, the issue is generally whether the dispute at hand comes within the terms of an existing arbitration agreement, and summary disposition of such issues is not always possible, so that the following principles have been developed to govern implementation of this statutory language:

> "* * * The usual formulation of the distinction is as follows: (1) If the matter sought to be arbitrated is clearly within the scope of the arbitration provision in the contract, and if the parties present the issue of arbitrability in a section 2 proceeding, then the court in such proceeding should find the matter arbitrable; (2) If the matter sought to be arbitrated is clearly not within the scope of the arbitration provision in the contract and if the parties present the issue of arbitrability in a section 2 proceeding, then the court should find the matter not arbitrable; (3) If the parties present the issue of the arbitrability of a given matter in a section 2 proceeding and it appears to the court that a reasonable doubt exists as to whether the matter is or is not within the scope of the arbitration provision in the contract, then the court should refer the issue of arbitrability to the arbitrator for initial decision, subject to ultimate *judicial* determination at the instance of either party in a section 12 proceeding; this disposition of the issue in a section 2 proceeding enables the court in the subsequent section 12 proceeding to utilize the arbitrator's expertise in the court's ultimate *judicial* determination of the issue. *Bel Pre Medical Center, Inc. v. Frederick Contractors, Inc.* (1974), 21 Md. App. 307, 320 A.2d 558." *Roosevelt University v. Mayfair Construction Co.* (1975), 28 Ill. App. 3d 1045, 1051, 331 N.E.2d 835, 840.

Accordingly, the action of the circuit court would be appropriate if reasonable doubt existed as to the arbitrability of the dispute between the parties. If there were no doubt, the issue of arbitrability should have been determined summarily.

Although there is a dispute whether an action for malicious prosecution could ever come within the terms of the reinsurance treaty here in question, the threshold issue in this case is whether the occurrence upon which liability is predicated was within the time period when the reinsurance treaty was in effect.

Security asserts that the reinsurance treaty in question had been mutually terminated by the parties at least eight months before the "occurrence" upon which defendant Harbor's liability is predicated. The reinsurance contract issued by Security was cancelled January 1, 1965. Not until August 1965 did Bertero obtain a successful conclusion of the original cross-complaint filed against him by the assured, National.

Defendant, Harbor, makes no rebuttal of this argument. Defendant, Continental Casualty Company, adopts Security's position. Defendant, Certain Underwriters at Lloyd's, however, contends that there are alternative dates which are determinative of Security's liability coverage for the malicious prosecution claim in the instant case. Specifically, they point to October 1, 1963, the date that National filed its cross-complaint against Bertero, and December 5, 1967, the date the cross-complaint was finally terminated in Bertero's favor.

The precise issue of when liability coverage for malicious prosecution claims arises has never before been adjudicated by the courts of this State. The issue has, however been addressed under the laws of two other States, but those two decisions, *Muller Fuel Oil Co. v. Insurance Company of North America* (1967), 95 N.J. Super. 564, 232 A.2d 168, and *Roess v. St. Paul Fire & Marine Insurance Co.* (M.D. Fla. 1974), 383 F. Supp. 1231, answered the issue in different ways.

In *Muller Fuel Oil Co. v. Insurance Company of North America,* the plaintiff insured filed a criminal complaint against one Policastro on November 13, 1961. Subsequently, the plaintiff obtained a comprehensive liability policy from the defendant insurer on December 1, 1962. Thereafter, Policastro was acquitted of the criminal charge on March 7, 1963. Policastro then filed a malicious prosecution action against the plaintiff. The defendant insurer denied coverage to the plaintiff on the grounds that the underlying proceedings giving rise to the malicious prosecution action had been instituted prior to the issuance of the policy. Plaintiff filed a declaratory judgment action against defendant insurer seeking coverage for the malicious prosecution claim. The trial court dismissed the complaint and plaintiff appealed.

The New Jersey Appellate Division concluded that the "occurrence" creating the legal obligation to pay preceded the policy. Since the tortious act was committed by the filing of the original criminal complaint and this constituted the essence of the tort of malicious prosecution, then the injury to the accused antedated the issuance of the policy even though the cause of action for malicious prosecution did not accrue until after the issuance. The court found the tortious act of instituting the proceedings and the injury sustained to be a *fait accompli* even though the injured party must await the favorable determination of the proceedings before seeking a redress of the wrong.

Under the reasoning of the New Jersey court in *Muller,* coverage under an occurrence liability insurance policy issued to National General Corporation in the instant case would attach on October 1, 1963, the date that National General filed its cross-complaint against Bertero.

A different result would obtain under the rationale in *Roess v. St. Paul*

*Fire & Marine Insurance Co.* (M.D. Fla. 1974), 383 F. Supp. 1231. In *Roess*, Caulfield, apparently financed by Roess, filed a taxpayer suit against Koubeck on November 22, 1967, challenging the legality of a construction project to be developed by Koubeck. On April 26, 1968, a final judgment in the case was entered in favor of Koubeck. Subsequently, on May 3, 1968, the defendant insurer issued a liability policy to Roess, the plaintiff insured. On June 24, 1968, Caulfield filed a cross-appeal to the Supreme Court of Florida from the judgment in Koubeck's favor. The litigation terminated on August 19, 1968, when the Florida Supreme Court denied Caulfield's petition for rehearing after it had affirmed the judgment for Koubeck.

Koubeck then brought suit for malicious prosecution against Roess on October 2, 1970. The defendant insurer denied coverage to Roess for the malicious prosecution claim. Roess settled the Koubeck claim and then brought suit against the defendant insurer alleging a breach of the insurance contract.

The United States District Court in Florida reasoned that the cause of action for malicious prosecution did not accrue until the termination of the underlying proceeding and noted that no element of the tort was more important or essential than any other element. Given this fact, the date of favorable termination, rather than commencement of the underlying malicious action was the occurrence triggering coverage under the policy. It was therefore held that coverage was afforded under the defendant insurer's policy. 383 F. Supp. 1231, 1235.

Under the reasoning of the Florida court in *Roess*, coverage under an occurrence liability policy issued to National would attach on December 5, 1967, the date the cross-complaint filed by National against Bertero was finally terminated in his favor.

■■ Until recently, the Illinois Supreme Court had provided little guidance from which to determine which of these two positions—New Jersey's or Florida's—was in accord with Illinois law. A recent decision, however, clearly defines the tort of malicious prosecution and makes it clear that the Florida position is in keeping with our law. In *Ritchey v. Maksin* (1978), 71 Ill. 2d 470, 376 N.E.2d 991, the Illinois Supreme Court held that five elements are necessary to state a cause of action for malicious prosecution.

> "[T]he complaint must contain facts which show (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the *termination of the proceeding in favor of the plaintiff*; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. *Fgeides v. Sani-Mode*

*Manufacturing Co.* (1965), 33 Ill. 2d 291, 295; *Alswang v. Claybon* (1976), 40 Ill. App. 3d 147, 150." 71 Ill. 2d 470, 475, 376 N.E.2d 991, 993 (emphasis added).

■■ Since the successful conclusion of the original action is a prerequisite to maintaining the malicious prosecution suit, the cause of action did not arise until August 1965, the date National's cross-complaint was terminated in Bertero's favor.[1] Given the fact that the reinsurance treaty between Security and Harbor had been mutually terminated some eight months earlier, on January 1, 1965, there was no longer a contractual relationship between the parties. Security was no longer bound to provide excess coverage for Harbor and no arbitration clause was in effect between the parties.

Thus, whereas there may have been reasonable doubt concerning the arbitrability of Harbor's claim at the time the parties' motions regarding arbitration were before the circuit court because at that time it was unclear when liability for malicious prosecution arose, there is no doubt at this time. The claim's basis was an event occurring after termination of the reinsurance treaty, and therefore the dispute was not within the terms of the parties' agreement to arbitrate disputes arising under that treaty. Because a reviewing court must apply the law as it exists at the time of its own decision (*Show of Shows, Inc. v. Illinois Liquor Control Com.* (1967), 86 Ill. App. 2d 109, 230 N.E.2d 268), notwithstanding the propriety of the circuit court's action in face of the then-existing uncertainty of our law, we must reverse. Accordingly, the order compelling arbitration is vacated.

Harbor has raised another issue in its pleadings, whether Security is estopped by its own conduct from disclaiming liability under the reinsurance treaty for this claim. The circuit court, however, expressly reserved consideration of this issue, and as determination of this issue is not necessary to dispose of the present appeal, Harbor's estoppel argument is not properly before this court. Accordingly, this cause is remanded to the circuit court for consideration of this and any other remaining issues under the declaratory judgment action.

Reversed and remanded.

McGLOON and O'CONNOR, JJ., concur.

---

[1] We note that the judgment was not affirmed on appeal until September 6, 1967, *Bertero v. National General Corp.* (1967), 254 Cal. App. 2d 126, 62 Cal. Rptr. 714, and did not become final until December 5, 1967. However, since eight months had already passed since the reinsurance treaty between Security and Harbor was mutually terminated, the subsequent disposition of the judgment is immaterial to our consideration.