PATERSON TALLOW CO., INC., A CORPORATION OF THE STATE OF NEW JERSEY, ALAN LAKIND, AND ELSIE LAKIND, ARNOLD LAKIND AND HOWARD LAKIND, EXECUTORS OF THE ESTATE OF MORRIS LAKIND, PLAINTIFFS-APPELLANTS, v. ROYAL GLOBE INSURANCE COMPANIES AND NEWARK INSURANCE COMPANY, DEFENDANTS-RESPONDENTS, AND JAMES BROWN, DEFENDANT.

Argued October 5, 1981—Decided April 19, 1982.

*Arnold C. Lakind* argued the cause for appellants (*Zauber, Szaferman, Lakind & Blumstein*, attorneys).

*Philip L. Geibel* argued the cause for respondents.

The opinion of the Court was delivered by

CLIFFORD, J.

This appeal questions the rights and obligations of the parties under an insurance contract. The insured, Paterson Tallow Co., Inc. (Paterson Tallow), contends that defendants Royal Globe Insurance Companies (Royal Globe) and its subsidiary Newark Insurance Company (Newark) were obligated to defend a malicious prosecution suit brought against them by a former employee. Defendant Newark issued the insurance policy after commencement but before completion of certain criminal proceedings instituted by Paterson Tallow against the former employee. Those criminal proceedings form the basis for the malicious prosecution claim. The trial court denied coverage on the strength of *Muller Fuel Oil Co. v. Insurance Co. of North*

*America,* 95 *N.J.Super.* 564 (App.Div.1967). The Appellate Division affirmed in an unpublished opinion. We granted certification, 87 *N.J.* 317 (1981), and now affirm.

I

On June 7, 1969, Paterson Tallow and its executive officers, Morris Lakind and Alan Lakind, commenced criminal proceedings against one James Brown, a former Paterson Tallow employee, by filing a complaint with the Jersey City Municipal Court charging Brown with the theft of several thousand pounds of meat from Paterson Tallow. Brown was indicted by a Hudson County Grand Jury on some of the charges.

On October 6, 1970, while those charges were pending, Paterson Tallow purchased from Newark a three year personal liability insurance policy. The policy contained comprehensive general liability insurance for bodily injury and property damage in addition to coverage for personal injury liability.[1] The personal

---

[1] In pertinent part the policy provided for the following coverage:

\* \* \* \* \* \* \* \*

Royal Globe Insurance Companies

Part 1 Comprehensive General Liability Insurance

1. COVERAGE A—BODILY INJURY LIABILITY
   COVERAGE B—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or

Coverage B. property damage

to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Part 16 Personal Injury Liability Insurance

1. COVERAGE P—PERSONAL INJURY LIABILITY

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury (herein

injury coverage insured Paterson Tallow against damages sustained by any person or organization as a result of certain "offenses" listed therein. Included among these offenses was "malicious prosecution."

On March 26, 1971, Brown was acquitted of all outstanding charges against him. On January 31, 1977, he initiated suit against Paterson Tallow and the Lakinds alleging that in 1969 Paterson Tallow "maliciously and without probable cause" had commenced criminal proceedings against him, which were eventually resolved in his favor.[2] Because plaintiffs had difficulty in

---

called "personal injury") sustained by any person or organization and arising out of one or more of the following offenses committed in the conduct of the named insured's business:

Group A—false arrest, detention or imprisonment, or malicious prosecution;

Group B—the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the named insured;

if such offense is committed during the policy period within the United States of America, its territories or possessions, or Canada, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

\* \* \* \* \* \* \* \*

EXCLUSIONS

This insurance does not apply:

\* \* \* \* \* \* \* \*

(d) to personal injury arising out of any publication or utterance described in Group B, if the first injurious publication or utterance of the same or similar material by or on behalf of the named insured was made prior to the effective date of this insurance.

[2] In the complaint Brown also maintained that on April 21, 1970 Paterson Tallow "maliciously and without probable cause" had commenced criminal proceedings in the Municipal Court of the Township of Wayne charging him with additional thefts.

finding their insurance policy and identifying the carrier, they undertook the defense of Brown's action through their own attorney. When the policy was finally located, plaintiffs demanded that Royal Globe and Newark take over the defense of Brown's malicious prosecution suit. Upon the carriers' denial of coverage, plaintiffs commenced this declaratory action. Shortly thereafter they settled Brown's claim.

Plaintiffs sought, *inter alia*, an order that Newark defend the action instituted by Brown. Defendants denied liability on the grounds that (1) all the acts that were alleged to constitute malicious prosecution took place before the policy was issued in 1970, and (2) even assuming coverage existed, Paterson Tallow had failed to provide the carriers with timely notice of Brown's claims—a contention the courts below did not address, nor do we, because of the conclusion that there was no coverage. The parties filed cross-motions for summary judgment.

In opposition to defendants' summary judgment motion, Paterson Tallow asserted that coverage was afforded under the policy because a crucial component of the malicious prosecution offense, namely, termination of the alleged maliciously-prosecuted proceedings in the victim's (James Brown's) favor, occurred during the policy period. It pointed out that with regard to coverages A and B (insurance against bodily injury and property damage liability), Newark used the word "occurrence" to describe the liability-creating event. In describing coverage P (personal injury liability), however, the policy referred to damages resulting from specified "offenses." The use of the word "offense" instead of "occurrence" in describing liability for torts such as malicious prosecution supported its claim of coverage, Paterson Tallow argued, because the "offense" of malicious prosecution could not have been complete until termination of the criminal proceedings in Brown's favor.

The trial court found the ruling of *Muller Fuel Oil Co. v. Insurance Co. of North America, supra,* dispositive and granted summary judgment for defendants. It noted that in this case,

as in *Muller*, the essence of the malicious prosecution action occurred before the effective date of the policy. It observed that the *Muller* approach has been adopted both in New Jersey and elsewhere. In addition, the court concluded that the use of the word "offense" instead of "occurrence" in describing the personal injury coverage was insignificant. It specifically declined to follow a contrary view taken in *Roess v. St. Paul Fire & Marine Ins. Co.*, 383 *F.Supp.* 1231, 1233–35 (M.D.Fla.1974). Finally, it found no ambiguity in the policy language. The fact that exclusion (d) specifically excluded from coverage any personal injury resulting from one's libel or slander committed prior to the effective date of the policy was deemed unpersuasive.

The Appellate Division, in a *per curiam* opinion, affirmed substantially for the reasons expressed by the trial court, citing *Muller, supra.*

## II

Initially, we must decide whether an insurance policy extends coverage for damages caused by a malicious criminal prosecution when the underlying criminal complaint is filed before the policy's effective date and the criminal proceedings are favorably terminated thereafter but during the policy period. Courts in other jurisdictions have reached conflicting conclusions. Although the Appellate Division has squarely decided this issue in *Muller Fuel Oil Co. v. Insurance Co. of North America, supra,* the question remains one of first impression for this Court.

The events in *Muller* are similar to those here. The *Muller* plaintiffs filed a criminal complaint against one Thomas Policastro on November 13, 1961. Policastro was arrested the following day and subsequently indicted in May 1962 for issuing a worthless check. In December 1962, while the criminal charges against Policastro were still undecided, plaintiffs purchased a comprehensive liability insurance policy from defendant, Insurance Company of North America (INA). Policastro was acquitted of the charges against him on March 7, 1963. He promptly

filed a malicious prosecution and false arrest suit against the plaintiffs on March 19, 1963.

Muller filed a claim for coverage under the policy, contending that Policastro's suit against it did not fully ripen until his acquittal in March 1963. Consequently, the acquittal constituted an "occurrence during the policy period" that entitled plaintiffs to coverage. INA denied coverage on the grounds that the criminal complaint that served as the basis for the malicious prosecution action was filed by the insured before the policy was issued. Plaintiffs then sought a declaratory judgment that coverage existed under the policy.

On appeal from a trial court decision dismissing plaintiffs' complaint the Appellate Division affirmed, ruling that the "essence" of the malicious prosecution action, the institution of criminal proceedings without probable cause, occurred before plaintiffs had obtained insurance coverage, 95 *N.J.Super.* at 576, citing *Earl v. Winne,* 14 *N.J.* 119, 134 (1953). The court observed that "[t]he tortious act is committed ordinarily by the filing of the criminal complaint with malice and without probable cause" and that "damage flows immediately from the tortious act" because often the accused is arrested and required to post bail and his reputation is adversely affected. 95 *N.J.Super.* at 576. It went on to contrast the "favorable termination" requirement with the remaining elements of proof:

> In addition to the proof of the termination in his favor, "the plaintiff must adduce affirmative proof * * * tending to show the falsity of or want of probable cause for the charge laid against him, or that the defendant did not honestly believe in his guilt." * * * Thus, although a favorable termination of the criminal proceeding is a condition precedent to institution of the action, the "essence" of the tort is the wrongful conduct in making the criminal charge.
>
> \*    \*    \*    \*    \*    \*    \*    \*
>
> Here we have the allegedly tortious conduct and injury to the accused as a result thereof antedating by more than a year the issuance of a policy in favor of the alleged tortfeasors, although the favorable termination of the criminal proceeding eventuates some three months after delivery of the policy. Thus, the "occurrence" which creates the legal obligation to pay damages precedes the commencement of the policy period, albeit the institution of suit may be delayed, as here, until favorable termination of the criminal proceeding. It would be

unreasonable to hold under those circumstances, and without more, that the insurance company intended to insure against a malicious prosecution suit, instituted subsequent to issuance of the policy, when four of the five essential ingredients of such an action preceded purchase of the policy—and those four constituted the "essence" of the tort. [*Id.* at 577.]

The Appellate Division acknowledged the general rule that the "occurrence" for the purposes of determining insurance coverage for a negligent tort is not the time when the wrongful act is committed but rather the time when the complaining party is actually damaged. However, it found this general proposition to be inapplicable to a malicious prosecution claim because "damage begins to flow from the very commencement of the tortious conduct—the making of the criminal complaint. * * * [W]rong and damage are practically contemporaneous." *Id.* at 579.

Only a handful of decisions from other jurisdictions have considered this precise issue. Of these, *Roess v. St. Paul Fire & Marine Ins. Co., supra,* and *S. Freedman & Sons v. Hartford Fire Ins. Co.,* 396 *A.*2d 195 (Ct.App.D.C.1978), deal most extensively with the problem. They therefore warrant our careful examination and comment.

In *Roess* the court reached a result contrary to *Muller.* There the malicious prosecution action arose from a civil suit brought against one Koubek in 1967. The suit, financed by the plaintiff, *Roess,* challenged the legality of a proposed construction project in the city of St. Petersburg, Florida. In April 1968 a trial court entered judgment in favor of Koubek but denied his application to enjoin future proceedings. Koubek appealed from that portion of the judgment denying injunctive relief. On June 24, 1968, the Florida Supreme Court affirmed the trial court's decision. In the interim between institution of the appeal and the date it was decided, Roess purchased an insurance policy from defendant, St. Paul Fire & Marine Insurance Co. The policy provided for indemnification against, among other risks, " 'personal injury' caused by the insured, including, by definition, 'malicious prosecution.' " 383 *F.Supp.* at 1233.

Koubek commenced the malicious prosecution against Roess on October 2, 1970. Roess then served notice upon St. Paul demanding coverage, which was refused. Roess and Koubek ultimately settled the malicious prosecution suit, after which Roess filed suit against St. Paul seeking reimbursement under the policy.

The court began its analysis by noting that under Florida law, favorable termination of the maliciously prosecuted suit was an essential element of the injured party's cause of action. Turning to the *Muller* decision and the framework of analysis posed there, the court acknowledged that the only real basis upon which *Muller* might be distinguished was that *Muller* involved a malicious criminal prosecution as opposed to malicious civil prosecution. It agreed with the Appellate Division's conclusion that the "essence" of a malicious criminal prosecution action was the initial filing of criminal charges, but it distinguished malicious civil prosecution, indicating that the essence of that tort could well be the continued prosecution of the suit by the plaintiff. The court commented as follows:

> While this difference clearly undermines the rationale of *Muller* as applied to the facts of this case, it must be recognized as a dubious point of distinction vis-a-vis the contractual relationship between the tortfeasor and his insurance carrier. Logically, as between those parties, it should make no difference as to the coverage afforded by the policy that the malicious prosecution was a criminal case rather than civil or *vice versa*. By the same token, however, the fact that the *Muller* rationale loses much of its force when applied in the setting of a maliciously prosecuted *civil* action suggests that the correctness of the decision is subject to question; and it is the view of this Court that the *Muller* rule would not be embraced by the Courts of Florida. [*Id.* at 1234–35.] [3]

---

[3]Obviously, the *Roess* court's criticism of *Muller* in this light turns upon the validity of its contention that the "essence" of a malicious civil prosecution is the continued prosecution of the underlying civil complaint. We find this contention unpersuasive, as it seems to suggest that no cause would lie where a malicious civil complaint is filed and subsequently withdrawn by the plaintiff, there being no malicious "continuation" of the proceedings. While the continuation of wrongfully initiated civil proceedings may be a factor in assessing the damages that accompany the maliciously prosecuted defendant's case, it certainly can have no bearing on the existence *vel non* of that person's cause of action in tort. Damages may begin to flow immediately

The court concluded by observing that there was nothing in the Florida cases to indicate that one element constituted the essence of the tort, thereby rendering it more important than any other element. Nor could it find any support, at least under Florida law, for the "favorable termination" requirement as a mere condition precedent.

On the other hand the *Muller* reasoning has been adopted by the highest court of the District of Columbia in *S. Freedman & Sons v. Hartford Fire Ins. Co., supra.* The facts can be summarized as follows. Plaintiff, S. Freedman Co., hired Pinkerton, Inc. to investigate a string of thefts suffered by the company in 1971. In August 1971 several employees, including one Bunyon, were fired. On May 12, 1972, Bunyon was arrested along with several other former Freedman employees. Thereafter, on May 23, 1972, Freedman expanded its general liability insurance policy with Hartford in order to include a provision for personal injury coverage. The additional coverage afforded by way of this expansion insured against, *inter alia*, the offense of malicious prosecution, "if such offense is committed in the conduct of the named insured's business during the policy period." 396 A.2d at 198 & n.1.

In August 1972, Bunyon was acquitted of the larceny charge and on February 2, 1973 he brought suit, charging Freedman with malicious prosecution and false arrest. Thereafter, Freedman requested that Hartford defend these actions based upon the expansion of Freedman's personal injury coverage. Hartford refused to defend on the grounds that the alleged tortious conduct antedated the expanded coverage.

On appeal from a trial court decision granting summary judgment to Hartford, the Court of Appeals recognized that prior authority in the District of Columbia held that favorable

---

upon the filing of the malicious civil complaint, assuming plaintiff can demonstrate some "special grievance" resulting from the maliciously instituted proceedings. See *Penwag Property Co., Inc. v. Landau*, 76 N.J. 595, 597–98 (1978).

termination of the underlying proceedings was a necessary prerequisite for the maintenance of a cause of action for malicious prosecution. While endorsing this position, the court nonetheless distinguished the date when the action could be brought from the date the offense occurred. Adopting the *Muller* approach, the court concluded that the gist of the malicious prosecution action occurs when the plaintiff has been improperly made the subject of a legal proceeding. Thus, the court differentiated between the *offense* of malicious prosecution and the elements that constitute the malicious prosecution *cause of action.* In denying coverage, the court commented upon the contrary result in *Roess v. St. Paul, supra* :

> Appellant relies upon the conclusion of the Florida District Court, that a third party's favorable termination in the Florida Supreme Court was the "operative occurrence triggering Roess' liability" * * * and that since that court decision followed the effective date of insurance coverage, an obligation to defend existed there. The contract at issue here, however, does not speak to the date that liability arises. It promises coverage "if such offense is committed * * * during the policy period * * *." To the extent that *Roess* did not consider when the offense occurred, it is irrelevant here. To the extent that it equated the triggering of liability with the time of the offense, there seems to be an error in its logic. As the present case reveals, the third party (here Bunyon) can secure a favorable termination and yet fail to prove that the insured is liable. Clearly, a third-party's failure to secure a favorable termination before bringing suit for malicious prosecution would not void the obligation of an insurance company to defend against such a suit, if the act alleged did fall within the policy period. Thus, the date of favorable termination cannot be regarded as equivalent to the date that the offense is committed. [*Id.* at 199 (citation and footnote omitted).]

In essence, the *Freedman* court's reasoning is identical to that employed in *Muller*: the offense of malicious prosecution is substantially completed once the complaint is filed, and the favorable termination of the maliciously prosecuted proceedings is merely a prerequisite to the filing of suit.[4]

---

4Although no one has raised the point in these proceedings, there is a statute of limitations question hovering in the background: does the cause of action for malicious prosecution accrue, for limitations purpose, when the "essence" of the tort—the filing of a complaint without probable cause—has been committed, or when the necessary prerequisite to the filing of suit—favorable termination of the maliciously prosecuted proceedings—has oc-

## III

Paterson Tallow contends that *Roess*, in conjunction with recent authority in this state, requires that we part company with *Muller*. In this connection, plaintiffs invite our attention to the elements of a cause of action for malicious prosecution as set forth in *Lind v. Schmid*, 67 *N.J.* 255 (1975):

> A malicious prosecution action arising out of a criminal prosecution requires proof: (1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff. [*Id.* at 262.]

See *Penwag Property Co. Inc. v. Landau*, 76 *N.J.* 595, 598 (1978).

In *Lind* we emphasized that a malicious prosecution plaintiff must establish *each* element set forth above, including the "favorable termination" requirement. We continue to adhere to that position and today's decision is in no wise at odds with that holding. Rather, our determination focuses exclusively on the time at which the *offense* of malicious prosecution occurs *for insurance coverage purposes. Lind* does not answer that question.[5] As we have sought to demonstrate, the Appellate Division in *Muller* and the Court of Appeals of the District of Columbia in *Freedman* present the appropriate framework.

---

curred? The *Muller* court determined that "[s]ince a suit for malicious prosecution must await a favorable termination of the criminal proceeding, the statute of limitations does not begin until such termination." 95 *N.J.Super.* at 577. That conclusion is consistent with our analysis, but we need not decide the point in this case.

[5]For a similar reason we reject the conclusions reached by the court in *Roess v. St. Paul, supra.* We believe that the result there was erroneous, owing largely to the court's willingness to afford the "favorable termination" element of a malicious prosecution cause of action a seemingly talismanic property, unyielding in the face of policy language that would have communicated to the average layman only one meaning. At any rate, for purposes of the instant policy, we find that the average reader would understand the language as fixing the point of coverage for malicious prosecution at one readily ascertainable date: the date on which the acts are committed that result in ultimate liability.

Alternatively, Paterson Tallow seeks to distinguish the policy language in *Muller* from that in the Newark policy. The INA policy in *Muller* covered "occurrences" that took place during the policy period, whereas plaintiffs' policy with Newark covers specified "offenses." Paterson Tallow argues that the word "offense" connotes an occurrence that gives rise to either civil liability or criminal punishment. Since no liability attached to plaintiffs' actions until termination of the criminal complaint against Brown during the policy period, they contend that no "offense" was committed until then. We are not persuaded that the suggested distinction between "offense" and "occurrence" requires us to abandon the result in *Muller, supra.*

Plaintiffs further urge that inasmuch as exclusion (d) in the policy excepts from coverage a defamation claim where the defamatory publication or utterance precedes the policy period, the absence of a similar exclusion for the related tort of malicious prosecution evidences an intent to cover malicious prosecution claims such as Brown's, based on proceedings begun before the effective date of the policy. Otherwise, the argument goes, exclusion (d) would be mere surplusage. Although this approach has an initial attraction, a careful inspection of the operative language set forth in exclusion (d) belies its validity. That exclusion states that coverage does not extend to acts of defamation "if the first injurious publication or utterance of the same or similar material * * * was made prior to the effective date of the insurance." That clause simply provides that where there is more than one injurious publication or utterance involving the same or similar material, no coverage exists if the first publication or utterance occurred before the effective date of the policy. The provision is not inconsistent with our interpretation of the coverage for malicious prosecution and is not relevant here.

## IV

We hold that for the purpose of determining the existence of coverage under this type of policy, in the absence of any

qualifying exclusion or exception the offense of malicious prosecution occurs on the date when the underlying complaint is filed. Inasmuch as the complaint in this case was filed before the effective date of the policy, we affirm the judgment of the Appellate Division denying coverage.

SCHREIBER, J., dissenting.

Coverage under an insurance policy depends in the first instance upon the agreement expressed in the contract of insurance. When tested by that simple principle, I find that this policy required the Royal Globe Insurance Company to defend its insured in a malicious prosecution suit, when the tort of malicious prosecution had been committed during the policy period.

The policy issued to the plaintiff Paterson Tallow Co., Inc. provided for various types of protection. One such protection, which is not at issue in this case, was to pay on behalf of the insured all sums that the insured should become legally obligated to pay as damages because of bodily injury or property damage caused by an "occurrence." The policy defined an occurrence as an accident "which results during the policy period in bodily injury or property damage."

A second type of protection required the insurance company to pay all sums that the insured should become legally obligated to pay as damages because of certain "offenses committed" by the insured during the policy period. The policy listed various offenses including malicious prosecution. The policy did not define the words "offenses committed."

Certain tenets should be applied when interpreting insurance contracts. Justice Francis commented in *Bowler v. Fidelity & Casualty Co. of N. Y.*, 53 *N.J.* 313 (1968) that:

Insurance policies are unipartite in nature. They are prepared by the company's experts, men learned in the law of insurance who serve its interests in exercising their art of draftsmanship. The resulting document with its many clauses is given to the insured in printed form upon the payment of the premium. There is no arm's length bargaining such as characterizes negotiations between equals

in the marketplace. *Consequently courts in their quest for justice for the insured, universally give him the benefit of any construction of the language which can be said fairly to represent the protection extended to him.* [*Id.* at 326; emphasis supplied.]

Justice Hall in *Butler v. Bonner & Barnewall, Inc.,* 56 *N.J.* 567 (1970) wrote that

if the controlling language of a policy will support two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied . . . . [*Id.* at 576]

Chief Justice Vanderbilt in *Herbert L. Farkas Co. v. N. Y. Fire Ins. Co.,* 5 *N.J.* 604 (1950) stated:

When policies of insurance were prepared by the insurer without any legislative restrictions, any ambiguities were resolved, under general principles of contract law, against the insurer, as the party who prepared the contract. [*Id.* at 610–11]

It is with these interpretive principles in mind that we must examine the policy. The central question is whether the policy may reasonably be construed to mean that a malicious prosecution was "committed" when the tort came into existence. I submit that such an interpretation is reasonable.

The essential elements of the tort of malicious prosecution are: (1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was activated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff. *Lind v. Schmid,* 67 *N.J.* 255, 262 (1975). In *Lind* we stated that "[t]he plaintiff must establish each element. Upon failure to prove any one, the cause must fail." Termination of the prosecution in favor of the plaintiff is a *sine qua non* of the tort of malicious prosecution. *Penwag v. Landau,* 76 *N.J.* 595, 598 (1978); *Earl v. Winne,* 14 *N.J.* 119, 134 (1953); *Prosser, Law of Torts,* § 119 at 835 (4th ed. 1971); *Dooley, 3 Modern Tort Law,* §§ 41.03, 41.06 (1977).

Despite the universal view that without favorable termination there can be no liability for malicious prosecution, the majority has created "the *offense* of malicious prosecution . . . *for insurance coverage purposes,*" which is committed at the time the

criminal complaint is filed. [*Ante*, at 35; emphasis in original.] No rationale or explanation has been advanced why this limited view should be adopted to deny coverage.

The majority relies substantially on an Appellate Division decision in *Muller Fuel Co. v. Insurance Co. of North America*, 95 *N.J.Super.* 564 (App.Div.1967), decided eight years before *Lind. Muller* was posited on the proposition, contrary to *Lind*, that favorable termination of the underlying criminal proceeding is merely a condition precedent to institution of a malicious prosecution action. I discern no reason to retreat from the *Lind* analysis, which accords with prominent authorities in the field, *Prosser, Law of Torts, supra; Dooley, Modern Tort Law, supra; Harper and James,* 1 *Law of Torts,* § 4.4 (1956), and with *The Restatement of the Law, Torts,* 2d, §§ 653 and 658.

The reasoning of *Muller* is not persuasive. The Appellate Division offered no authority for the contention that, although an "essential ingredient," termination in favor of the plaintiff is not required to create the tort of malicious prosecution. In fact, without such favorable termination, the legal obligation to pay damages does not arise; there can be no legal injury until all essential elements of the tort have occurred. The view I have espoused has been followed in other jurisdictions when insurance policy coverage for malicious prosecution has been at issue. *Roess v. St. Paul Fire and Marine Insurance Company,* 383 *F.Supp.* 1231 (M.D.Fla.1974) and *Security Mut. Cas. Co. v. Harbor Ins. Co.,* 65 *Ill.App.*3d 198, 21 *Ill.Dec.* 707, 382 *N.E.*2d 1 (App.Ct.Ill.1978), *rev'd on other grounds,* 77 *Ill.*2d 446, 34 *Ill.Dec.* 167, 397 *N.E.*2d 839 (Sup.Ct.1979).

The Appellate Division in *Muller* ignored the interpretive guidelines applicable to insurance policies. Instead it viewed the policy from what "the insurance company intended to insure against" and stated that it would be unfair to "shift the burden of damages to an unwary insurance company." [*Id.* 95 *N.J.Su-*

*per.* at 578]. It might be urged that the carrier did not intend coverage if some elements of malicious prosecution existed when the policy was issued. However, that could be the precise exposure for which the insured was seeking protection. If the insurance company did not want to accept the risk, it could have requested any pertinent information about criminal proceedings which the prospective insured had instituted. Then the company could have refused to issue the policy or inserted an appropriate exclusion.

The majority asserts that "the average reader would understand the policy language as fixing the point of coverage for malicious prosecutions at . . . the date on which the acts are committed that result in ultimate liability." [*Ante,* at 35 n.5]. This approach permits a carrier to rely on the public's ignorance of the legal elements of the offense. The fairer methodology is to assume that the insured has been made aware of the legal elements of malicious prosecution. Thus 1 *Couch on Insurance* 2d § 15:20 states that "[w]hile words should be given their ordinary meaning, they must be construed in accordance with established rules of law, even though the insured may not be familiar with their legal meaning." Once the malicious prosecution elements are known, the average reader would contemplate that he had coverage if the criminal action had been terminated adversely to his position during the policy period.

I would reverse the summary judgment in favor of defendant and remand the cause for trial.

Justice HANDLER joins in this dissent.

*For affirmance*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, POLLOCK and O'HERN—5.

*For reversal and remandment*—Justices SCHREIBER and HANDLER—2.