ETHICON, INC., Plaintiff,

v.

The AETNA CASUALTY AND SURETY COMPANY, Defendant.

No. 85 CIV. 7640 (PKL).

United States District Court,
S.D. New York.

June 14, 1988.

**120**

Patterson, Belknap, Webb & Tyler, New York City (David F. Dobbins, Robert P. Lobue, Craig Stewart, of counsel), for plaintiff.

Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y. (Erica B. Garay, Daniel Gammerman, Thomas M. Gandolfo, of counsel), for defendant.

## OPINION & ORDER

LEISURE, District Judge:

This is a diversity action brought pursuant to 28 U.S.C. § 1332 involving the liability of The Aetna Casualty and Surety Company ("Aetna") to Ethicon, Inc. ("Ethicon"), a subsidiary of Johnson & Johnson ("J & J"), for a claim asserted by Ethicon under insurance policies issued by Aetna. Ethicon seeks indemnification for money paid in satisfaction of an $18,900,000 judgment rendered against it in *Handgards, Inc. v. Ethicon, Inc.*, 552 F.Supp. 820 (N.D.Cal. 1982), *aff'd*, 743 F.2d 1282 (9th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 963,

83 L.Ed.2d 968 (1985). Aetna has disclaimed coverage and refuses to indemnify Ethicon. Aetna has moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the issue of date of loss, claiming that if Aetna must indemnify Ethicon, only the policy in effect in 1962 can be the basis for recovery. Ethicon has cross-moved for summary judgment on the issue of date of loss, claiming that Aetna is liable on policies in force from 1961 to 1974, inclusive. The only issue before the Court is what policies may potentially be triggered by the claims allegedly constituting malicious prosecution under the Aetna policies. For the reasons stated below, the cross-motions of Aetna and Ethicon are granted in part and denied in part.

## FACTUAL BACKGROUND

The following facts are derived from the affidavits and Local Rule 3(g) statements of the parties, a Stipulation of Facts the parties have agreed to, and documentary exhibits submitted to the Court.

The origins of this case date back to 1962, and the underlying lawsuits by and against Ethicon comprise a long and tortuous history. In October, 1962, Ethicon filed two patent infringement actions alleging infringement of the Gerard patent method, a process by which disposable plastic gloves were made by using a heat seal. The two actions were consolidated,[1] and the suit was dismissed because of a prior use of the Gerard method. The dismissal was affirmed by the Ninth Circuit. *Ethicon, Inc. v. Handgards, Inc.*, 432 F.2d 438 (9th Cir.1970), *cert. denied*, 402 U.S. 929, 91 S.Ct. 1525, 28 L.Ed.2d 863, *reh'g denied*, 403 U.S. 912, 91 S.Ct. 2204, 29 L.Ed.2d 690 (1971).[2]

---

1. Ethicon filed suit against Plasticsmith, Inc., in the U.S. District Court for the District of Delaware on October 30, 1962. On October 31, 1962, it filed suit against Mercury Manufacturing Company in the U.S. District Court for the District of Nebraska. The suits were transferred to the U.S. District Court for the Northern District of California and consolidated after Handgards purchased the assets of both companies. Stipu-

lation of Facts (Annexed to Defendant's Rule 3(g) Statement) ¶¶ 5–7, 12 (hereinafter Stip. Facts).

2. This action will be referred to as the patent action in order to minimize confusion that may result because of the numerous suits involving Handgards and Ethicon.

On January 24, 1967, Ethicon filed an action against T. Hamil Reidy ("Reidy") in Chicago, Illinois, for allegedly infringing the Gerard patent. Reidy was the chief executive officer of the predecessor corporations of Handgards. The action was transferred to the Northern District of California and dismissed without prejudice by the court. (Order, March 18, 1968, Index No. 67 C 123). Stip. Facts ¶ 13.

In June, 1968, after the dismissal of Ethicon's patent action, Handgards filed a complaint against Ethicon and J & J alleging that Ethicon and J & J had violated, *inter alia,* sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, by conspiring to restrain trade in the disposable glove market from 1961 until the suit was commenced. The antitrust action was tried before a jury in January and February of 1976. In July of 1976, the court entered judgment awarding Handgards $6,219,000 after trebling. Stip. Facts ¶ 27. In 1979, the judgment was reversed by the Ninth Circuit because of erroneous jury instructions, and remanded for a new trial. *Handgards, Inc. v. Ethicon, Inc.,* 601 F.2d 986 (9th Cir.1979), *cert. denied,* 444 U.S. 1025, 100 S.Ct. 688, 62 L.Ed.2d 659 (1980).

Following remand, Handgards moved to amend its complaint to assert a claim for common law malicious prosecution. The motion, opposed by Ethicon, was denied, and the case went to trial on the antitrust issues. The district court awarded Handgards a judgment of $11,826,936.10 after trebling, plus interest and attorney's fees. The district court's decision was affirmed on appeal. 743 F.2d 1282 (9th Cir.1984), *cert. denied,* 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985). After the denial of certiorari, Ethicon and Handgards agreed to settle the amount owing on the judgment at $18,900,000.

On or about June 15, 1984, Ethicon first notified Aetna of its claim under the personal injury liability insurance policy issued by defendant to J & J and its subsidiaries

for the year 1968. By letter dated November 9, 1984, Aetna disclaimed coverage on the grounds that, *inter alia,* J & J's failure to notify Aetna contravened the policy requirement that written notice of claim be given as soon as practicable; the policy provided no coverage for injury arising out of wilful violation of a penal statute for antitrust damages; and the insured at no time informed Aetna that it was seeking coverage for intentional and malicious acts it had committed.

On September 26, 1985, Ethicon filed this suit seeking indemnification under successive comprehensive general liability insurance, excess indemnity and excess overlayer indemnity policies in force from 1961 to 1974. Only one policy was in effect when the original patent action was commenced in 1962. This was policy # 38 AL 5000 ("the 1961 policy")[3] issued to "Johnson & Johnson *et al.*" effective January 1, 1961, through January 1, 1964. Endorsement 32 of the 1961 policy required Aetna to pay on behalf of J & J and its subsidiaries:

> all sums which the insured shall become legally obligated to pay as damages because of injury sustained by any person, or organization and arising out of the following hazards in the conduct of the named insured's business ...:
>
> \* \* \* \* \* \*
>
> Hazard A. False arrest, detention or imprisonment, or malicious prosecution.

Endorsement 32 stated that "[t]his endorsement applies only to injury occurring on and after the effective date hereof, during the policy period...."

The 1961 policy was replaced by policy # 38 AL 9608,[4] effective January 1, 1964 through January 1, 1967 ("the 1964 policy"). Endorsement 41 of the 1964 policy deals with personal injury liability coverage and uses substantially the same language as Endorsement 32 of the 1961 policy.

---

**3.** Annexed as Exhibit B–1 to the Affidavit of Eve C. Rosen in Support of Defendant's Motion for Partial Summary Judgment, sworn to on April 22, 1986 (hereinafter "Rosen Affidavit").

**4.** Annexed as Exhibit B–2 to Rosen Affidavit.

The 1964 policy was replaced by policy # 38 AL 128800,[5] effective January 1, 1967, through January 1, 1970 ("the 1967 policy"). Endorsement 37 of the 1967 policy deals with personal injury liability, but the form and language of the endorsement are substantially different from that used in the previous policies:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury (herein called "personal injury") sustained by any person or organization and arising out of one or more of the following offenses: Group A—False arrest, detention or imprisonment, or malicious prosecution;

\* \* \* \* \* \*

if such offense is committed during the policy period. . . .

The 1967 policy was replaced by policy # 38 AL 138750,[6] effective January 1, 1970, through January 1, 1973 ("the 1970 policy"). Endorsement 37 of this policy deals with personal injury liability in substantially the same terms as the 1967 policy. The 1970 policy was in turn replaced by policy # 38 AL 144156,[7] effective January 1, 1973, through January 1, 1974 ("the 1973 policy"). The 1973 policy contained language virtually identical to that used in the 1967 and 1970 policies.

In addition to the basic coverage provided by the Comprehensive General Liability (CGL) policies described above, J & J and its subsidiaries carried excess indemnity or umbrella policies. The relevant language of each umbrella policy commencing on January 1 of 1964,[8] 1967,[9] 1970,[10] and 1973[11] is substantially the same. The 1964 policy provides that Aetna "will indemnify the Insured for all sums which the Insured shall become legally obligated to pay as damages and expenses . . . because of personal injury or property damage, caused by an occurrence anywhere in the world." "Personal injury" is defined as including "injury arising out of false arrest, detention or imprisonment, malicious prosecution. . . ."

In addition to the umbrella policies, Ethicon secured two excess overlayer policies. The first, # 38 XN 1/SC,[12] was effective January 1, 1970, through January 1, 1973, and the second, # 38 XN 07,[13] was effective January 1, 1973, through January 1, 1974. Both policies incorporate by reference the controlling underlying policy in effect at the time, and in both cases, the controlling underlying policy was the umbrella policy then in effect.

Ethicon now asserts that the gravamen of the claim on which judgment was rendered against it in the antitrust action was that Ethicon had maintained the patent action in bad faith and that the antitrust violation therefore constitutes a malicious prosecution under the Aetna policies. Although Aetna disputes this contention, for the purposes of this motion, Aetna has agreed to put aside the issue of whether the patent action on which the antitrust recovery was based is a "malicious prosecution" under the policies. The sole issue is thus what policies, if any, were triggered by $18,900,000 judgment against Ethicon.

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together

5. Annexed as Exhibit B–4 to Rosen Affidavit.

6. Annexed as Exhibit B–6 to Rosen Affidavit.

7. Annexed as Exhibit B–9 to Rosen Affidavit.

8. Policy # 38 XS 3 SC, effective January 1, 1964, through January 1, 1967, annexed as Exhibit B–3 to Rosen Affidavit.

9. Policy # 38 XS 36 SC, effective January 1, 1967, through January 1, 1970, annexed as Exhibit B–5 to Rosen Affidavit.

10. Policy # 38 XS 1046 SCA, effective January 1, 1970, through January 1, 1973, annexed as Exhibit B–7 to Rosen Affidavit.

11. Policy # 38 XS 1040 SCA, effective January 1, 1973, through January 1, 1974, annexed as Exhibit B–10 to Rosen Affidavit.

12. Annexed as Exhibit B–8 to Rosen Affidavit.

13. Annexed as Exhibit B–11 to Rosen Affidavit.

with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." As the Supreme Court has noted, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which were designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1) (citation omitted). "In considering the motion, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–49, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 249 (2d Cir.1985)).

The Court must first look to the substantive law governing the case to determine which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. at 2510. Once the Court has determined what facts are material, it must then determine whether there is a genuine issue as to a material fact. At this stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. The standard for summary judgment thus "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250, 106 S.Ct. at 2511.

■ The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The burden on the moving party will be "discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. The burden then shifts to the nonmoving party to show that there is a genuine issue of fact for trial. *See Anderson,* 477 U.S. at 248–49, 106 S.Ct. at 2510–11. When, as in this case, both sides move for summary judgment, the Court must apply the same standard to both motions. *Eastman Machine Co. v. United States,* 841 F.2d 469, 473 (2d Cir.1988). Mindful of the foregoing principles, the Court now turns to the merits of the parties' cross-motions for summary judgment.

■ Under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court sitting in diversity jurisdiction must apply the substantive law of the state in which it is sitting, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Aetna Casualty and Surety Co. v. General Time Corp.,* 704 F.2d 80 (2d Cir. 1983). New York courts have traditionally resolved choice of law issues involving insurance policies by applying the law of the state which the parties understood would be the principal location of the risk and the state most intimately concerned with the outcome of the litigation. *See, e.g., Steinbach v. Aetna Casualty and Surety Co.,* 81 A.D.2d 382, 385, 440 N.Y.S.2d 637, 640 (1st Dept.1981). In the instant case, the policies were issued in New Jersey, the principal risk is located there, and New Jersey is the principal place of business and state of incorporation of the insured. Defendant's Memorandum of Law in Support of Its Motion for Partial Summary

Judgment at 4, n. 3 (hereinafter "Defendant's Memo"). Plaintiff agrees with defendant that New Jersey law governs the case. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment and in Support of Plaintiff's Cross–Motion for Partial Summary Judgment at 2 (hereinafter "Plaintiff's Memo"). The Court will therefore apply New Jersey law. *See Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 n. 5 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987).

Aetna urges the Court that the case of *Paterson Tallow Co., Inc. v. Royal Globe Ins. Co.,* 89 N.J. 24, 444 A.2d 579 (1982), controls the instant case. The issue in that case, as stated by the New Jersey Supreme Court at the outset of its opinion was "whether an insurance policy extends coverage for damages caused by a malicious criminal prosecution when the underlying criminal complaint is filed before the policy's effective date and the criminal proceedings are favorably terminated thereafter during the policy period." 444 A.2d at 582.

Ethicon maintains that *Paterson Tallow* can be distinguished on several grounds. First, it dealt with a malicious criminal prosecution, whereas the underlying action here was civil. Second, the action in *Paterson Tallow* was malicious when commenced, but the action here, at least on the theory Handgards apparently pursued in the antitrust action, did not become malicious until some point after its inception. Third, the language of the insurance policies at issue here differs from that used in the policy construed in *Paterson Tallow.* Finally, Ethicon maintains that *Paterson Tallow* did not address the issue of whether subsequent policies are triggered when the injury that results from the prosecution is continuous, rather than inflicted at one time. After close examination of *Paterson Tallow* this Court finds that it governs this case.

The Paterson Tallow Company ("Paterson Tallow") commenced criminal proceedings against James Brown by filing a complaint charging Brown with the theft of several thousand pounds of meat from Paterson Tallow. While those charges were pending, Paterson Tallow purchased from Royal Globe Insurance Company ("Royal Globe") a three year personal liability insurance policy that covered, among other things, malicious prosecution actions. Subsequently, Brown was acquitted of all charges against him, and he later sued Paterson Tallow for malicious prosecution. Paterson Tallow demanded that Royal Globe take over the defense of the case, but the insurance company denied coverage.

Royal Globe argued that it was not liable because "all the acts that were alleged to constitute malicious prosecution took place before the policy was issued...." *Paterson Tallow,* 444 A.2d at 581. Paterson Tallow maintained that "coverage was afforded under the policy because a crucial component of the malicious prosecution offense, namely, termination of the alleged maliciously-prosecuted proceedings in the victim's (James Brown's) favor, occurred during the policy period." *Id.*

The *Paterson Tallow* court began its analysis of the legal issues in the case by noting that the issue was one of first impression in the New Jersey Supreme Court, and that courts in other jurisdictions had reached conflicting conclusions. *Id.* at 582. The court first turned to a lower New Jersey court decision which had previously addressed the issue, *Muller Fuel Oil Co. v. Insurance Co. of North America,* 95 N.J. Super. 564, 232 A.2d 168 (App.Div.1967). In *Muller,* the plaintiff sought a declaratory judgment that a comprehensive general liability policy issued by defendant insurance company covered plaintiffs for a malicious prosecution suit brought by Thomas Policastro. Policastro was arrested as a result of a criminal complaint brought by Muller. Policastro was indicted before Muller bought the policy at issue and acquitted after Muller purchased the policy. Once acquitted, Policastro brought suit against Muller for malicious prosecution.

The court noted that "[a]s a general rule the time of the 'occurrence' of an accident within the meaning of an indemnity policy

is not the time the wrongful act was committed but the time when the complaining party was actually damaged." *Muller*, 232 A.2d at 175. But the *Muller* court went on to find an exception to the general rule because in a malicious prosecution action the "essence" of the tort, the filing of the criminal complaint, is such that "wrong and damage are practically contemporaneous." *Id.* The court therefore concluded that the "occurrence" triggering liability was the filing of the complaint, and since the complaint was filed before the policy was issued, it was not covered by the policy. *Id.* at 173–78.

The *Paterson Tallow* court then considered other decisions that had addressed the issue. In *Roess v. St. Paul Fire & Marine Ins. Co.*, 383 F.Supp. 1231 (M.D. Fla.1974), a malicious prosecution action arose from a civil suit brought by Roess against Koubek. After the case was decided at the trial level in favor of Koubek, but before it was affirmed on appeal, Roess purchased an insurance policy from defendant that provided for indemnification against malicious prosecution. The *Roess* court turned to the *Muller* ruling as the only precedent in such a case. Acknowledging that *Muller* involved a criminal prosecution and *Roess* a civil suit, the *Roess* court found that this distinguishing factor was meaningless because it did not concern the contractual relationship between the insured and the insurance carrier. *Roess*, 383 F.Supp. at 1234–35. The court nevertheless declined to follow *Muller* because Florida courts would not rule that the essence of the tort is the filing of the complaint. Instead, a Florida court would hold that favorable termination of the suit was a prerequisite to triggering the insurer's duty to indemnify. Because the favorable termination of the suit occurred during the policy period, the *Roess* court found in favor of coverage.

The *Paterson Tallow* court also commented on the distinction between civil and criminal cases:

> Obviously, the *Roess* court's criticism of *Muller* in this light turns upon the validity of its contention that the "essence" of a malicious civil prosecution is the contin-

ued prosecution of the underlying civil complaint. We find ths contention unpersuasive, as it seems to suggest that no cause would lie where a malicious civil complaint is filed and subsequently withdrawn by the plaintiff, there being no malicious "continuation" of the proceedings. While the continuation of wrongfully initiated civil proceedings may be a factor in assessing the damages that accompany the maliciously prosecuted defendant's case, it certainly can have no bearing on the existence *vel non* of that person's cause of action in tort. Damages may begin to flow immediately upon the filing of the malicious civil complaint, assuming plaintiff can demonstrate some "special grievance" resulting from the maliciously instituted proceedings.

444 A.2d at 584 n. 3. The example given by the court in rejecting the notion that malicious continuation is the gravamen of the offense in a malicious civil proceeding was a case in which "a malicious civil complaint is filed and subsequently withdrawn by the plaintiff, there being no malicious 'continuation' of the proceedings." *Id.* Hence, the court did not squarely address the issue that plaintiff claims is raised here: whether an action that is not malicious in its inception but becomes so by its continuation is covered.

The *Paterson Tallow* court next considered the case of *S. Freedman & Sons v. Hartford Fire Ins. Co.*, 396 A.2d 195 (D.C. 1978). In *Freedman*, the highest court of the District of Columbia adopted the *Muller* court's reasoning in a case dealing with a similar fact situation. The insurance company had issued a policy after commencement but before completion of criminal proceedings instituted by Freedman against an employee. The court concluded that the event triggering liability is the occurrence or offense itself, not the favorable termination of the action. *Freedman*, 396 A.2d at 199.

The *Paterson Tallow* court decided to follow *Muller* and found that "for purposes of the instant policy, we find that the average reader would understand the lan-

guage as fixing the point of coverage for malicious prosecution at one readily ascertainable date: the date on which the acts are committed that result in ultimate liability." *Paterson Tallow,* 444 A.2d at 585 n. 5. The court also rejected Paterson Tallow's contention that a result different from *Muller* should obtain because the court in *Muller* interpreted a policy that covered "occurrences," whereas the policy in *Paterson Tallow* covered "offenses." *Id.* at 585–86. The court concluded that "for the purpose of determining the existence of coverage under this type of policy, in the absence of any qualifying exclusion or exception the offense of malicious prosecution occurs on the date when the underlying complaint is filed." *Id.* at 586.[14]

For *Paterson Tallow* to govern this case, the patent action must be held a malicious prosecution within the meaning of the policies. As noted above, Aetna denies that the patent action that led to the antitrust recovery could constitute "malicious prosecution" within the meaning of the policies. Aetna agreed, however, "to put aside, for the purposes of this motion only, this area of dispute." Defendant's Memo at 11. But in its reply brief, Aetna argues:

> If Ethicon is correct that it did not begin its patent litigation maliciously, it is clear that Ethicon has no viable claim to coverage under any of the policies issued to it by Aetna. In order to establish a *prima facie* case of malicious prosecution in New Jersey, a plaintiff must plead and prove that the underlying action was initiated with malice and without probable cause. *See Penwag Property Co., Inc. v. Landau,* 76 N.J. 595, 388 A.2d 1265 (1978). If Ethicon did not commence the patent infringement suit with malice then, had Handgards sued Ethicon solely for common law malicious prosecution, Handgards could not have succeeded in its suit and there would be no malicious

> prosecution award to indemnify since Handgards could not have pled and proven a *prima facie* case. Thus the elements of an antitrust suit based on bad faith prosecution are *not* identical to a malicious prosecution, and there is no coverage for the Handgards award.

> The fact that Handgards prevailed without proving that Ethicon initiated the patent infringement suit with malice, is proof that the underlying litigation was only an antitrust suit and not a common law malicious prosecution. Indeed, Handgards attempted to include such a common law claim in 1980 (a further admission that such a common law claim was not part of Handgards' supplemental complaint) but its motion was opposed by Ethicon and denied by the Court. (*See* Stipulation of Facts, paragraph 30). Accordingly, there is no judgment based upon a common law malicious prosecution to indemnify.

Defendant's Reply Memorandum of Law at 17, n. 5.

This is, of course, an issue that logically precedes the question decided by the Court today. For if the patent action cannot be a "malicious prosecution" within the meaning of the policies, there can be no coverage. Assuming, however, that the patent action does constitute a "malicious prosecution," *Paterson Tallow* governs the result here.

*Paterson Tallow* did not decide or change the elements of the tort of malicious prosecution; rather, it decided the scope of coverage for "malicious prosecution" under an insurance policy. The court specifically commented: "our determination focuses exclusively on the time at which the *offense* of malicious prosecution occurs *for insurance coverage purposes.*" 444 A.2d at 585 (emphasis in original). The court held that the offense, not the tort, of

---

**14.** Two of the seven Justices on the New Jersey Supreme Court dissented, relying on the principle of interpretation that an insurance policy, when ambiguous, should be interpreted in favor of coverage. 444 A.2d at 586–87 (Schreiber, J., dissenting). The Court is not unmindful of this principle, but finds that *Paterson Tallow* governs the instant case.

The dissenting Justices also rejected the rationale of *Muller* and found that favorable termination is not a mere procedural condition precedent to bringing suit, but an element of the action, so that a claim cannot accrue until the underlying suit is terminated in favor of the party suing for malicious prosecution.

malicious prosecution occurs at the time the complaint is filed.

*Paterson Tallow* dealt with malicious criminal prosecution where the only action by the tortfeasor is the initiation of the proceedings. The machinery of the state then takes over the prosecution of the action. The court sought a readily ascertainable date on which the offense occurred, and sensibly arrived at the date on which the action was commenced. *Paterson Tallow,* 444 A.2d at 585 n. 5. The court indicated in dicta that it would also consider the date of the filing of a malicious civil complaint to be determinative. *Id.* at 584 n. 3.

The fact that the *Paterson Tallow* decision concerned malicious criminal prosecution rather than malicious civil prosecution does not sufficiently distinguish it from the instant case. The party sued in the malicious suit suffers from the same type of conduct in either case. Moreover, the point at which the suit becomes malicious is not controlling. In a criminal or civil prosecution that is malicious from its inception, injury begins to flow from the time when the complaint is filed. This is no less true of a civil prosecution that becomes malicious only later. The party being sued suffers the same injury whether the plaintiff knows the suit is baseless when the suit is commenced or only discovers later that the complaint lacks merit.

Ethicon urges this Court to adopt the reasoning followed by many courts in cases of continuous injury resulting from latent effects of asbestos or drug ingestion. Yet Ethicon cites no case in which a New Jersey State court has so ruled. Rather, it urges the Court to rely on a line of federal court cases that have adopted a multiple trigger approach in cases of continuous injuries. *See, e.g., Lac D'Amiante du Quebec v. American Home Assurance Co.,* 613 F.Supp. 1549 (D.N.J.1985); *Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982). The court in *Lac D'Amiante* concluded that a multiple trigger was appropriate because the injury "caused by asbestos is both continuous and progressive and certainly not complete upon the act of installation." *Lac D'Amiante,* 613 F.Supp. at 1561 (footnote omitted). The court indicated that its reasoning was not limited to asbestos cases, and cited cases dealing with water seepage, *California Union Ins. Co. v. Landmark Ins. Co.,* 145 Cal.App.3d 462, 193 Cal.Rptr. 461 (1983), and dry rot, *Gruol Constr. Co. v. Insurance Co. of North America,* 11 Wash.App. 632, 524 P.2d 427 (1974). *Lac D'Amiante,* 613 F.Supp. at 1560.

Ethicon argues that the offense of malicious prosecution is a continuing offense, and the continuous trigger that courts have applied in asbestos-type cases should also apply here. Plaintiff cites the basic rule that "it is 'well-settled that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time when the wrongful act was committed, but the time when the complaining party was actually damaged.'" Plaintiff's Memo at 22 (quoting 11 *Couch on Insurance 2d* § 44 at 194 (1982)). This is the general rule, but the *Lac D'Amiante* court's decision was based on one important factor not present here: "The feature common to all of these claims is that the alleged harm does not become manifest until years, and often decades, after a plaintiff's exposure to asbestos...." 613 F.Supp. at 1555. Moreover, the New Jersey Supreme Court addressed the issue in *Paterson Tallow,* and found that wrong and damage are practically contemporaneous in a malicious prosecution action, so that the time of filing the complaint governs. *Paterson Tallow,* 444 A.2d at 586.

In *Paterson Tallow,* the court found that the insurer did not have to indemnify the insured even though some injury occurred during the policy period. The court concluded that a multiple trigger was inappropriate, and fixed the date of filing the complaint as the date that triggers insurance coverage. The *Paterson Tallow* holding that the date of filing the complaint governs the determination of when injury occurs is broad enough to cover this case.

As the Court of Appeals for the Third Circuit has noted, albeit in a different context,

the federal court should proceed with great caution when the effect of its ruling would be to broaden the law beyond the point where any other Court has yet ventured.

\* \* \* \* \* \*

[W]e cannot assume, on such scant evidence, that the New Jersey Supreme Court would adopt such a rule with its sweeping implications.

*W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 218 (3d Cir.1984). The New Jersey Supreme Court has not yet ruled on the multiple trigger approach. It has, however, clearly stated that the date of filing the complaint determines when the injury from a malicious prosecution occurs. *Paterson Tallow*, 444 A.2d at 586. This Court must follow New Jersey law on this issue. The only policies potentially triggered are those in effect when the complaint was filed.

■ It is clear that the 1961 policy was in effect when Ethicon filed the complaint in 1962 against Handgards' predecessor companies. Injury therefore resulted under the 1961 policy during the policy period, and that policy is potentially triggered. As for the 1964 CGL and umbrella policies, no new act of malicious prosecution took place while those policies were in effect, so there can be no coverage under those policies.

■ In 1967, however, Ethicon commenced a new suit against T. Hamil Reidy, owner of the predecessor corporations of Handgards. According to its papers, Ethicon knew that this action was malicious when commenced. There is some dispute, however, as to whether injuries sustained as a result of that suit are covered by the antitrust damages award, and therefore part of the $18,900.00 judgment against Ethicon. Because this issue is the subject of a genuine factual dispute, partial summary judgment cannot be entered on this basis. Thus, the 1967 CGL policy and the 1967 umbrella policy may potentially be triggered.

As to the 1970 and 1973 CGL, umbrella and excess overlayer policies, no complaint

was filed when they were in effect, so those policies cannot be triggered. Ethicon contends that those policies were triggered because of the appeals and petitions for certiorari filed during the years the policies were in effect. Plaintiff's Memo at 44. This contention is meritless. To find that an action that is not initially covered may be brought within coverage by further wrongful action is contrary to common sense and public policy.

## CONCLUSION

The Court finds that the date of loss is 1962 and perhaps also 1967. The 1961 policy is therefore potentially triggered,[15] and the 1967 CGL and umbrella policies may also be triggered. The remaining eight policies are not triggered, and the Court orders that summary judgment be entered in favor of Aetna on those eight policies.

The parties are hereby ordered to contact the Court within ten days of the date of this opinion to set a date convenient for counsel and the Court for a pretrial conference.

SO ORDERED.

---

**15.** This opinion does not decide the question whether the 1961 policy or any other policy actually provides coverage. It merely decides what policies may potentially be triggered.