(778 P.2d 359)
No. 59,731
No. 60,875

STANLEY UHOCK and THELMA UHOCK, *Appellants*, v. PHIL SLEIT-
WEILER d/b/a ACTIVE PEST CONTROL, *Defendant/Third-Party
Plaintiff*, v. CLYDE SHERVE d/b/a SHERVE PEST CONTROL, *Third-
Party Defendant/Appellee*, v. NATIONAL INDEMNITY COMPANY,
*Garnishee/Appellee*.

Opinion filed July 8, 1988.

*William Scott Morris* and *Mark R. Plettner*, of Morris & Plettner, Chartered, and *Blake A. Post*, of Topeka, for the appellant.

*Paul D. Post*, of Paul D. Post, P.A., of Topeka, for the third-party/appellee.

*Rex Henecke* and *Casey R. Law*, of Turner and Boisseau, Chartered, of Great Bend, for the garnishee/appellee.

Before DAVIS, P.J., JOHN W. BROOKENS, District Judge Retired, assigned, and M. KAY ROYSE, District Judge, assigned.

ROYSE, J.: This is a consolidation of two appeals by plaintiffs from orders of the trial court dismissing third-party defendant Sherve and dismissing the garnishment filed against National Indemnity Company.

A threshold question is whether plaintiffs' appeal from the dismissal of third-party defendant Sherve was timely. The trial court directed verdict for Sherve on May 7, 1986. The next day, the trial court entered judgment by judgment form, but that form only referred to the jury verdict against defendant Sleitweiler. The judgment form made no mention of the directed verdict in favor of Sherve. Plaintiffs filed their appeal on July 1, 1986. On September 12, 1986, a journal entry was filed in the district court, which did journalize the directed verdict in Sherve's favor.

Plaintiffs' appeal, then, was filed after the court's decision but before judgment as to Sherve was entered by journal entry. Such a notice of appeal is considered premature, and becomes effective when the journal entry is filed. Rule 2.03 (1987 Kan. Ct. R. Annot. 7). Plaintiffs' appeal was timely.

Plaintiffs contend that the trial court erred in directing a verdict for third-party defendant Sherve based on the statute of limitations. Resolution of this question requires a review of the procedural history of this case. Plaintiffs filed their action against Sleitweiler in March 1985, alleging he was liable to them for termite damage to their home. Defendant Sleitweiler subsequently filed a third-party petition against Sherve. Sleitweiler alleged that Sherve should be required to indemnify Sleitweiler for any damages recovered by plaintiff against defendant from losses incurred prior to December 29, 1977.

Plaintiffs never formally amended their petition to assert claims against Sherve, nor did they invoke their right to assert such claims pursuant to K.S.A. 60-214(a). At the pretrial confer-

ence on February 3, 1986, counsel for plaintiffs simply stated that plaintiffs claimed Sherve had been negligent in performing the initial treatment for termites.

While plaintiffs have cited no authority for the procedure used in this case, and we certainly express no approval of the informal manner in which plaintiffs attempted to assert a claim against Sherve, we will assume that such a claim was stated on February 3, 1986, at the pretrial conference.

The applicable statute of limitations in this case is two years. K.S.A. 1987 Supp. 60-513(a). The statute further provides that:

" . . . the causes of action listed in subsection (a) shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party, but in no event shall an action be commenced more than 10 years beyond the time of the act giving rise to the cause of action."

When an act results in injury not immediately apparent to the injured party or when the injury is delayed for a period of time, the statute of limitations does not run from the date of the wrongful act, but begins to run when the injury is substantial or reasonably ascertainable. *Olson v. State Highway Commission*, 235 Kan. 20, 24, 679 P.2d 167 (1984). When the evidence is disputed as to when substantial injury results or when injury becomes reasonably ascertainable, the issue must be determined by the trier of fact. *Kristek v. Catron*, 7 Kan. App. 2d 495, 496, 644 P.2d 480, *rev. denied* 231 Kan. 800 (1982).

Plaintiffs contend that conflicting evidence existed as to when they discovered the termite damage. The conflicting evidence came from the plaintiffs. Thelma Uhock testified she "was pretty sure in [19]83" that there was termite damage. Later, she testified that plaintiffs discovered the termite damage in 1982, and that Sleitweiler had admitted in 1982 that there was termite damage. According to Thelma, by 1982, the floor was "rotted out" and "eaten up." She testified that, in 1982, Sleitweiler promised in writing to do a partial termite retreatment on the home.

Stanley Uhock testified that they first discovered the damage in 1983, but he later indicated he was unsure about the exact dates regarding discovery of the termites. The record also reflects that in November 1983, Sleitweiler promised to replace

the entire kitchen floor which had been damaged by termites.

Whether the damage was discovered in 1982 or 1983, the plaintiffs' claim was asserted against Sherve more than two years later—on February 3, 1986.

Plaintiffs seek to avoid this conclusion by arguing that they first discovered the cause of the damage to their home in 1984. They point to the report they received from Alex Hawkins in March 1984, concluding that the chlordane level in the soil was insufficient to protect against termites and that portions of the home had been improperly treated. Plaintiffs' argument is not persuasive. In *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 608 P.2d 936 (1980), the Supreme Court rejected a claim that the statute of limitations is tolled until the precise cause of injury is ascertained. The *Friends University* case concerned a new roof which began leaking in 1970 or 1971. Friends complained to the roofing contractor and the manufacturers. In 1975, Friends obtained an expert's report, which pinpointed the cause of the leaks. Friends filed suit in 1977. The trial court entered summary judgment in favor of the manufacturers, concluding that Friends' claims were barred by the statute of limitations.

The Supreme Court affirmed, holding the statute of limitations began to run when Friends knew of the serious leak, not in 1975.

"From 1970 forward, Friends was complaining about the roof and demanding that the roof problems be remedied. Friends frequently urged the defendants and the roofing company to stop arguing among themselves about whose fault it was and repair the roof. The fact Friends had not determined the exact scientific cause of the leaking did not toll the running of the statute. Fully cognizant that a severe problem existed, Friends elected to seek nonjudicial resolution of the controversy. Simply stated, Friends lost its right to a judicial determination of the dispute by its own delay and inactivity." 227 Kan. at .563.

The trial court did not err in concluding that plaintiffs' claim against third-party defendant Sherve was barred by the statute of limitations. Because the trial court properly directed verdict for the third-party defendant, the other issues raised by plaintiffs in 86-59731-A are moot.

One other matter remains to be determined in this appeal. Sherve seeks an award of attorney fees under Rule 7.07(b) (1987 Kan. Ct. R. Annot. 35). We do not find that the appeal in this case was frivolous, and, therefore, the request for an allowance of fees is denied.

Plaintiffs' second appeal challenges the trial court's dismissal

of the garnishment filed against National Indemnity Company. During discovery in the principal action, plaintiffs learned that defendant Sleitweiler was insured by National Indemnity Company. After plaintiffs obtained a verdict against Sleitweiler, they issued a garnishment against National Indemnity. National Indemnity filed a motion to dismiss the garnishment, which was sustained by the trial court. The trial court's order of dismissal was filed on December 5, 1986.

Garnishee National Indemnity Company urges that this appeal should be dismissed because it was not timely filed. The trial court's order of dismissal was mailed to plaintiffs' counsel on December 8, 1986. Plaintiffs filed a motion to alter or amend judgment, pursuant to K.S.A. 60-259(f), on December 17, 1986. The trial court overruled that motion, and on April 20, 1987, a journal entry was filed to reflect that action. Plaintiffs filed their appeal on May 7, 1987.

Under K.S.A. 60-2103(a), an appeal must be filed within thirty days from the entry of judgment. A motion to alter or amend judgment, filed within ten days of the entry of judgment, tolls the time for appeal. *Caplinger v. Carter*, 9 Kan. App. 2d 287, 290, 676 P.2d 1300, *rev. denied* 235 Kan. 1041 (1984); K.S.A. 60-259(f); K.S.A. 60-2103.

The Supreme Court has recently considered the issue raised in this case. In *Danes v. St. David's Episcopal Church*, 242 Kan. 822, 752 P.2d 653 (1988), the Court held:

"[W]here notice of the entry of judgment is mailed in compliance with K.S.A. 60-258 and Rule 134, the time for filing postjudgment motions or taking an appeal starts to run when the notice is mailed, and the three-day extension as provided in K.S.A. 60-206(e) applies." 242 Kan. at 827.

In this case, plaintiffs' motion to alter or amend was filed nine days after the order of dismissal was mailed. The plaintiffs filed their appeal within thirty days after that motion was overruled. Under the *Danes* ruling, the plaintiffs' appeal is timely.

The question raised by plaintiffs' appeal in the garnishment proceeding is whether National Indemnity's policy provides coverage for Sleitweiler's negligent failure to adequately treat the Uhock home. Plaintiffs contend (1) that K.S.A. 2-2448 requires policy coverage for inadequate treatment, and (2) the policy language provides coverage for inadequate treatment.

K.S.A. 2-2448 provides in part:

"The secretary shall not issue a pesticide business license until the applicant has furnished proof of financial responsibility including a surety bond or a certificate of liability insurance as a condition precedent to such license being issued. . . . Such bond shall be to the State of Kansas and shall be conditioned upon compliance by the principal and by the principal's officers, agents, representatives and employees, with the provisions of this act and acts amendatory thereof and supplemental thereto.

"The liability insurance policy shall provide coverage (a) for not less than $25,000 for bodily injury liability for each occurrence; and (b) for not less than $5,000 for property damage liability for each occurrence, and with not more than a $500 deductible clause for each occurrence."

When a policy of insurance is issued to an insured in compliance with the requirements of a statute, the pertinent provisions of the statute must be read into the policy, and no provisions of the policy in contravention of the statute can be given effect. *Canal Insurance Co. v. Sinclair*, 208 Kan. 753, 758, 494 P.2d 1197 (1972). In interpreting a statute, the courts should give effect to legislative intent as expressed by the language of the statute. *State v. Adee*, 241 Kan. 825, 829, 740 P.2d 611 (1987); *Underwood v. Allmon*, 215 Kan. 201, 204, 523 P.2d 384 (1974). In addition to considering statutory language, however, courts may also look to the historical background of the enactment, the circumstances surrounding its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. *Brown v. Keill*, 224 Kan. 195, 200, 580 P.2d 867 (1978).

K.S.A. 2-2448 requires a pesticide business to furnish proof of financial responsibility to obtain a pesticide business license. Such proof of financial responsibility may take the form of liability insurance, but the statute does not specify the scope of required liability insurance or define "occurrence."

The legislative history and circumstances surrounding the passage of the Kansas Pesticide Law indicate that K.S.A. 2-2448 requires coverage for damage to persons or property resulting from the negligent application of pesticides. The Kansas Pesticide Law was passed in 1976, to bring Kansas into compliance with the Federal Environmental Pesticide Control Act of 1972. The Kansas Pesticide Law also revised and consolidated the provisions of two earlier acts, the Pesticide Use Law and the Pest Control Act. See Ryan, Kansas Environmental Protection Law, 51 J.K.B.A. 289, 293, 304 (Winter 1982); Report on Kansas Leg-

islative Interim Studies to the 1975 Kan. Legislature, Proposal No. 4—Pesticide Use and Control Laws, p. 24 (Dec. 1974, part 1).

The interim report prepared on the Kansas Pesticide Law indicates that the principal purpose of the legislation is to prevent pesticides from harming human health and the environment. "[P]esticides are poisons and, if used improperly or without sufficient knowledge of their side effects, they can endanger man and animals. . . . [I]n order to maintain a continued use of these beneificial pesticides, there is much need for certain regulations and knowledge of pesticide use." Report on Kansas Legislative Interim Studies to the 1975 Kan. Legislature, p. 28. See also *Ernest v. Faler*, 237 Kan. 125, 134, 697 P.2d 870 (1985).

The predecessors to the Kansas Pesticide Act were also designed to prevent pesticide damage. The purpose of the Kansas Pesticide Use Law, for example, was:

"to regulate in the public interest, the use, manufacture, transportation and application of insecticides, fungicides, herbicides, defoliants, desiccants, plant growth regulators, nematocides, rodenticides, and any other pesticide. New pesticides are continually being discovered or synthesized which are valuable for the control of insects, fungi, weeks, nematodes, rodents, and for use as defoliants, desiccants, plant regulators and related purposes. If not properly used, pesticides may injure man, wildlife or other animals, either by direct poisoning or by gradual accumulation of poisons in the tissues. Crops or other plants may also be injured by their improper use. The drifting or washing of pesticides into streams or lakes can cause appreciable damage to aquatic life. A pesticide applied for the purpose of killing pests in a crop, which is not itself injured by the pesticide, may drift and injure other crops or nontarget organisms with which it comes in contact." K.S.A. 2-2415 (Weeks 1975, repealed L. 1976, ch. 1, § 32), quoted in *Taylor v. Department of Health & Environment*, 230 Kan. 283, 286, 634 P.2d 1075 (1981).

The Kansas Pesticide Law is intended to prevent damage from pesticide use. In that context, the legislative history and circumstances surrounding the enactment of K.S.A. 2-2448 indicate that the coverage mandated is liability for damage caused by pesticides. Nothing in the statute suggests that K.S.A. 2-2448 is designed to protect individuals against damage caused by pests.

The decision relied on by plaintiffs, *Binder v. Perkins*, 213 Kan. 365, 516 P.2d 1012 (1973), does not require a different result. Binder brought suit, alleging his alfalfa crop was damaged by drifting fumes when defendant sprayed a neighbor's field for weeds. The Supreme Court affirmed the trial court's finding of liability for the damage. The *Binder* decision concerned damage caused by pesticides. It in no way stands for the proposition that

K.S.A. 2-2448 requires insurance coverage for damage caused by pests.

Finally, plaintiffs argue that the Health Care Provider Insurance Availability Act (K.S.A. 40-3401 *et seq.*) demands a conclusion that garnishee's policy must cover defendant's negligence here. Two distinguishing factors are readily apparent. First, the singular purpose of K.S.A. 40-3402 is to assure protection against medical negligence, while the Kansas Pesticide Law is to protect against damage from pesticides. Second, K.S.A. 40-3402 mandates "coverage for legal liability arising out of the performance of professional services rendered or which should have been rendered by a health care provider." K.S.A. 1987 Supp. 40-3401(j). The Kansas Pesticide Law includes no reference to pesticide services which should have been rendered.

Consequently, the provisions of the Kansas Pesticide Law do not require insurance coverage for damages caused by termites. The language and legislative history of K.S.A. 2-2448 demonstrate that liability coverage must be obtained for damages caused by pesticides.

Plaintiffs contend that, even if K.S.A. 2-2448 does not require coverage in the present case, the policy itself provides coverage. Garnishee argues, and the trial court concluded, that coverage does not extend "to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith." (Exclusion O.)

Rather than unduly extend this opinion, it is sufficient to note that the Supreme Court has previously ruled this exclusionary language is unambiguous and is applicable in cases such as the one here. *Owings v. Gifford*, 237 Kan. 89, 92-3, 697 P.2d 865 (1985). The "work" referred to in the exclusion can only refer to the property treated by Sleitweiler. See *Green Construction Co., Inc. v. Liberty Mutual Ins. Co.*, 213 Kan. 393, 396, 517 P.2d 563 (1973). To paraphrase the analysis used in *Owings*:

When an exterminator treats a home, warranties arise both under his contract with the owner and by operation of tort law. Since an exterminator can control the quality of his work, he is liable to the owner when the work is faulty. The risk that the exterminator may incur liability under warranty is a normal part of doing business. The exterminator may obtain a performance

bond or purchase a guarantee of contractual performance for repair or replacement of faulty workmanship.

Under operation of law, a second type of risk that arises is injury to people and damage to property other than the work performed. Unlike the first type of risk, when liability is limited to the cost of replacement or repair, the duty imposed by law (tort liability) subjects the exterminator to unlimited liability. For this risk, the exterminator purchases liability insurance for bodily injury or property damage. Provisions of a general liability policy provide coverage only if the insured work or product actively malfunctions, causing injury to an individual or damage to another's property.

In short, the *Owings* decision notes that a general liability policy "is not a performance bond or a guarantee of contract performance." 237 Kan. at 94. See also *Isaac v. Reliance Insurance Co.*, 201 Kan. 288, 294-95, 440 P.2d 600 (1968).

The trial court did not err in dismissing the garnishment against National Indemnity Company.

Affirmed.