238 N.J. Super. 531 (1990)
570 A.2d 443
LEONARD GOTTLIEB AND ESTHER GOTTLIEB, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
NEWARK INSURANCE COMPANY AND ROYAL INSURANCE COMPANY, DEFENDANTS-RESPONDENTS, AND APEX PEST CONTROL, INC. AND PAUL GALASSO AND CAROL GALASSO, T/A APEX PEST CONTROL, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 19, 1989.
Decided February 13, 1990.
*532 Before Judges PRESSLER, LONG and LANDAU.
Richard M. Goldman argued the cause for appellants (Goldman & Goldman, attorneys; Vincent E. Ludwig on the brief).
Joseph G. Mosolino argued the cause for respondents Newark Insurance Company and Royal Insurance Company. (Joseph G. Mosolino, attorney; Joseph G. Mosolino of counsel and on the brief).
The opinion of the court was delivered by LANDAU, J.A.D.
Appellants Leonard and Esther Gottlieb (Gottliebs) are homeowners who sued defendant Apex Pest Control, Inc. (Apex) in a separate action to recover for damages suffered by reason of the application of toxic chemicals, chlordane and heptachlor, to the exterior, basement tool room, and crawl space of their home in May 1982. Their home was tested on April 28, 1983 by Princeton Testing Labs and presence of those chemicals was found in a map room, upstairs bedroom, study and an air duct in the music room. None of those rooms had been treated.
In February 1985, another test was performed, disclosing that the chemicals had migrated further, into the living room *533 and master bedroom. The house was decontaminated in December 1985.
Apex was insured for property damage and liability risk by defendant-respondent Newark Insurance Company, a subsidiary of Royal Insurance Company (collectively "Newark") under annual "Select-Cover" policies which contained comprehensive general liability coverage beginning January 3, 1982. The property damage liability limits were $25,000 in 1982, $50,000 in 1983, and $1,000,000 in 1984 and 1985. Although the Gottliebs received an offer to settle their claim for the full amount of the 1982 policy which Newark says is applicable, they brought this declaratory action seeking a determination that as a matter of law coverage for their damage was also afforded under the later policies.[1]
The trial judge initially accepted this view, denying Newark's motion for summary judgment and granting summary judgment on the Gottliebs' cross-motion. We granted leave to appeal. Following a motion to supplement the record with a copy of the actual insurance policy, we ordered a limited remand to permit such supplementation and an opportunity for the trial judge to consider the effect of the definition of "occurrence" contained in the text of the policy which was not theretofore of record. After hearing oral arguments, the trial judge entered an order which vacated the original order of judgment and granted summary judgment to Newark, holding that the policy unambiguously defined occurrence to include all damages which commenced in 1982, irrespective of the subsequent dates of injury.[2]
*534 From this summary judgment, the Gottliebs appealed.[3] Their substantive position is that under Apex's policies, which are "occurrence" rather than "claims made" forms, the migration of contamination to untreated areas of their house which was discovered in two subsequent tests constituted separate and additional triggering events for coverage under policies in effect at the time of each discovery. Newark says that the time of application of the pesticides and the initial discovery of contamination in the Gottlieb house, both of which occurred in 1982, should constitute the only "occurrence" under the policy, regardless of when additional rooms or areas were found to be contaminated by migration of the chemicals. Each party relies on policy definitions contained in the 1982 policy which is now of record, and cites authority purporting to sustain its respective position, picking and choosing cases from among a bewildering plethora of authority which has developed in recent years, particularly as the result of the increasing number of toxic tort cases in which injuries do not manifest themselves until long after the wrongful acts, occasionally appearing unpredictably over the period of several insurance policies.
The trial judge and the parties assumed that this complex issue could be resolved by summary judgment on the limited undisputed facts of record. We disagree and reverse.[4]
In granting summary judgment to Newark, the trial judge held that there was no factual dispute and that declaratory judgment could be granted as a matter of law because there had been an initial application of the chemical substance with *535 the "same structure suffering continuous exposure to it ..." The policy provides that, "[o]ccurrence means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." It also provides that, "[f]or the purpose of determining the limit of the company's liability, all bodily injury and property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." The term "property damage" is defined to mean, "(1) physical injury to or destruction of tangible property which occurs during the policy period. ..." (Emphasis added).
The principal basis for the Gottliebs' claim that coverage under Apex's post 1982 policies should also be provided is the theory that the migration uncovered in 1983 and 1985 constituted injuries suffered in later policy periods and thus coverage under those later policies was triggered. They urge that we adopt the so-called continuous trigger theory often applied in toxic tort cases where injuries continue to surface long after the tortious act itself.
This theory, notably expounded in Keene Corp. v. Ins. Co. of North America, 215 U.S.App.D.C. 156, 667 F.2d 1034 (1981), cert. den., 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), reh'g den., 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982), holds that where an injury process is not a definite, discrete event, the date of the occurrence should be the continuous period from exposure to manifestation of damage. The subject has been discussed in a Harvard Law Review Note, "Developments in the Law  Toxic Waste Litigation," 99 Harv.L.Rev. 1458, 1578-82. The note suggests that the continuous trigger theory, and indeed other theories respecting occurrence, typically arise out of efforts to maximize insurance coverage by use of the ambiguity approach.
*536 It has been indisputably determined in New Jersey that the time of the occurrence of an accident is not the time when the wrongful act was committed, but the time when the complaining party was damaged. See Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 483 A.2d 402 (1984). In cases where there has been continuing damage, however, as typified in toxic tort contamination cases involving the migration of toxic chemicals, it begs the question merely to say that "the time of the `occurrence' ... is not the time the wrongful act was committed, but the time when the complaining party was actually damaged." Id. at 27, 483 A.2d 402.
Contrary to Newark's argument, this issue has not been resolved by our opinion in Doria v. Ins. Co. of North America, 210 N.J. Super. 67, 509 A.2d 220 (App.Div. 1986). In Doria, where one child was drowned in a swimming pool accident and a second drowned while attempting to rescue the first, the court found that there was but a single occurrence, particularly as both the tortious event and the injuries were concentrated within the same immediate period. Neither does the language of the policies, as held by the trial judge, clearly resolve the occurrence question. As interpreted in Hartford, the time of injury determines the existence of an occurrence. However, as in Hartford and Doria, the injury must occur during the policy period, because the latter phrase is incorporated in the definition of "property damage" in the Gottliebs' policy. In Hartford and in Muller Fuel Oil Co. v. Ins. Co. of North America, 95 N.J. Super. 564, 232 A.2d 168 (1967) the "when" of an occurrence was set down as the time when the effects of the tortious actions are felt. And, as we pointed out, the Apex policy requires that property damage, i.e. physical injury to tangible property, must occur during the policy period. Thus, under the continuous trigger theory, the question here would be whether there were injuries suffered during 1983 and 1985, as well as in 1982.
We recognize that the Keene multiple or continuous trigger theory is not uniformly accepted and that there is no present *537 consensus. See Keeton, Insurance Law, § 5.10 (1988); Independent Petrochemical Corp. v. Aetna Cas. & Surety Co., 654 F. Supp. 1334 (D.D.C. 1986). However, in 1983 the Federal District Court for New Jersey decided Sandoz, Inc. v. Employer's Liability Assurance Corp., 554 F. Supp. 257 (D.N.J. 1983), in which Judge Sarokin held that while "a carrier would not normally be held liable for injuries sustained before its coverage commenced or after it terminated" each insurer would be liable to indemnify for the damages resulting from the injuries which occurred during its policy period. Additionally, in Lac D'Amiante Du Quebec v. Am. Home Assur. Co., 613 F. Supp. 1549 (D.C.N.J. 1985), Judge Barry, who was required to follow New Jersey law in an asbestos case, predicted that the New Jersey Supreme Court would adopt the holding in Keene, supra, 657 F.2d 1034, that where there was a continuing injury, there was also a continuing trigger of coverage to the extent injury occurred during a policy period. In short, Lac D'Amiante adopted the continuous trigger theory, based upon its prediction that New Jersey courts would do so.[5]
The facts present in this case suggest that the Gottliebs may have experienced an injury in each of several years. To that extent, as their proofs may show, we agree with the Sandoz and Lac D'Amiante courts that Apex and, in consequence, the Gottliebs are not precluded from resort to the policies in effect during the several periods of injury. In short, we agree that the continuous trigger theory reflects the law in New Jersey.
We hold, however, that this issue is fact sensitive and not properly the subject of an absolute rule. For example, we would expect inquiry into the factual questions of when all of the damage from migrating pesticide was capable of being known or predicted, and whether prompt notification and early *538 correction in 1982 or 1983 would have prevented the costly correction of subsequent chemical migration or other damages. Resolution of such factual questions must be considered in light of Apex's contractual duty under its policy to give written notice of an occurrence to Newark as soon as practicable. Did the Gottliebs notify Apex? What was the scope of their notice? When did they notify Apex? Did Apex notify Newark? What was the scope of its notice?
While a tort victim is entitled to the benefit of the same favorable coverage interpretation as the insured tortfeasor, Eggerding, supra, 20 N.J. at 113, 118 A.2d 820, his rights against the insurer ordinarily should rise no higher than those of the insured whose contractual rights he seeks to enforce. Thus, we would not blindly invoke the continuous trigger theory when either an insured's or victim's dilatory response has produced the very continuum relied on to enhance coverage. Moreover, sometimes, as in Paterson Tallow Co., Inc. v. Royal Globe Ins. Co., 89 N.J. 24, 444 A.2d 579 (1982), a case in which coverage for malicious criminal prosecution was involved, the applicable trigger may be determined by the nature of the unique insured risk.
If, as commentators[6] and courts[7] have suggested, the various triggering theories of coverage have been less legal theories than labels for the achievement of the desired result of maximizing insurance coverage, they have nonetheless been fact sensitive on the equities presented. No less is called for here. Thus, if Apex or the Gottliebs failed to provide requisite notice, and additional preventable damage occurred in a later period, a decision respecting the triggering of coverage under several policies should reflect this. It goes to the reasonableness of the policyholder's expectations. This is particularly so here, where the liability coverage was increased to $1,000,000 in *539 1984, an action unlikely to be taken by an insurer who was informed of the 1982 and 1983 inspection results, and presumably aware of the Sandoz and Keene opinions.

CONCLUSION
As both legal and factual issues remain to be explored in this matter, we reverse the grant of summary judgment and remand the matter for trial on the issues of coverage provided in the years after 1982. As previously indicated, the issue of 1982 coverage is resolved by the pleadings and concessions of record.

Endnote
4. Neither party has pleaded or raised the issue of absence of "completed operations" coverage in the policies, and accordingly our opinion is rendered solely on the basis of the "occurrence" issues presented. For future consideration in resolution of similar cases, the particular policy form should ordinarily be examined to determine if the type of liability asserted is an insured risk.
For example, the policy form provided after our remand in the present case is designated as a "Select-cover Policy." It unambiguously provides eight boxes to check respecting the coverage purchased, and further provides that "[t]he insurance afforded is only with respect to such of the following coverage Part(s) as are indicated by entry of an `X' below." There follow three columns of coverage offerings in which only one box contains an "X;" that which is designated "Part 1  Comprehensive General Liability Insurance." The box marked "Part 4  Completed Operations and Products Liability Insurance" was not marked with an "X".
Expressed as a general rule, "[t]he comprehensive general liability policy provides protection to an insured, generally a contractor, under premises  operations coverage, who performs work at various locations but once such operation has been completed, as defined, it is excluded under the policy and if the insured requires liability protection from losses that may *540 occur from its work product it then must carry completed operations coverage or else it is without protection." Appleman, Insurance Law and Practice, § 4508.03, at 388-390 (Berdal ed. 1979).
The definition in the 1982 policy of record in this case is as follows:
"completed operations hazard" includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the name insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
(1) when all operations to be performed by or on behalf of the named insured under the contract have been completed,
(2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or
(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.
Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.
Comprehensive general liability insurance forms usually contain exclusions which track the theory that completed operations and products liability coverage must be the subject of specific insurance coverage. Thus, in Apex's policy it is provided that the insurance does not apply:
(n) to property damage to the named insured's products arising out of such products or any part of such products; (o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith; (p) to damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein. (Emphasis added).
On the other hand, the comprehensive general liability insurance is stated not to apply:

*541 (m) to loss of use of tangible property which has not been physically injured or destroyed resulting from .. . (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured; but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured; ... (Emphasis added).
Policy interpretation disputes in insurance coverage litigation are frequently resolved on the basis of "reasonable expectations" of the insured where policy ambiguities are perceived. Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 612, 503 A.2d 862 (1986). In addition, the purpose for which the insurance has been secured may be relevant to the question of reasonable expectations or to public policy considerations which may be weighed in balancing interests where a case poses questions of interpretation.
Our independent research discloses that the New Jersey Department of Environmental Protection (Department) has long had a policy of requiring evidence of financial responsibility as part of its registration program for pesticide applicators such as Apex. N.J.A.C. 7:30-7.4(a)1., proposed in 1982, adopted effective June 6, 1983, required as a condition of registration, submission of an attestation by the person providing the coverage that the business "has in force an insurance policy (or surety bond in equivalent amounts) which meets or exceeds" bodily injury liability of $100,000 for each occurrence and $300,000 in the aggregate and property damage liability of $50,000 for each occurrence. The regulation also then required that the attestation submitted in accordance with this requirement contain a statement to indicate that the "person providing the coverage will notify the Department in writing and within 15 days if the policy or surety bond is cancelled for any reason."
On February 4, 1985 proposals for further amendments to the regulations were made and were later adopted effective *542 November 4, 1985. These set forth like dollar insurance requirements, but added a new provision, N.J.A.C. 7:30-7.4(a)3., which provided "[a]s an alternative to insurance coverage, the business shall have deposited with the Department a surety bond in favor of any person who may suffer damage by reason of the operation of the pesticide applicator business. The surety bond for applicator businesses pursuant to (a)1. above shall be a minimum of $100,000 ..." These financial responsibility requirements and the 1985 amendment provide some insight into what the State hoped to accomplish by way of protection for persons who suffered "damage by reason of the operation of the pesticide applicator business."
Thus, in future cases, it may be important to explore whether the insured secured coverage in an attempt to comply with State registration requirements, and whether the insurer was given to understand the purpose for which the insurance was contracted.
It is of considerable interest that in its effort to see to it that the regulations respecting insurance provided the protection intended, the Department further amended its regulations in 1988. The amendments reflect departmental concern that liability insurance forms purchased by exterminators furnish the kind of protection necessary to cover off-premises applications of pesticides which had previously been completed. Thus, the 1988 liability insurance regulation requires, "(i) liability insurance coverage with the equivalent of a $300,000 combined single limit of liability for bodily injury and property damage, which includes coverage for completed operations." N.J.A.C. 7:30-7.4(a)1.i. (Emphasis added). In addition, reflecting the common provision of an exclusion clause for pollution liability in most liability policies, the Department of Environmental Protection also now requires that, "[a]s part of the coverage required in (a)1i above, coverage for chemical liability is required, for the types of pesticide application performed. This chemical liability coverage shall provide coverage equivalent to that provided by the Insurance Services Office (ISO) standard *543 endorsement GL 04 09 (which provides chemical liability coverage for the ground application of pesticides by Pesticide Applicator Businesses)." N.J.A.C. 7:30-7.4(a)1.ii. It appears obvious that, as its sophistication grew, the Department concluded that its objective of protecting persons who may suffer damage "by reason of the operation of the pesticide applicator business" could not be met simply by comprehensive general liability coverage.
As might be expected, cases interpreting the law respecting completed operations are not always entirely in harmony. See Appleman, supra, § 4508.03, and annotations thereto. See also, Henderson, "Insurance Protection for Products Liability and Completed Operations  What Every Lawyer Should Know," 50 Neb.L.Rev. 415 (1971); Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A.2d 788 (1979) (which cites favorably Dean Henderson's article). Weedo held that the comprehensive general liability policy was not designed to cover the cost of correction of improperly performed work even when this necessitates substantial replacement and rebuilding. Justice Clifford offered the following illustration:
When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case. [A comprehensive general liability form].
Id. at 240, 405 A.2d 788. The Weedo Court emphasized an interpretative analysis approach which began with looking at the grant of insurance coverage in the policy, rather than the language of the exclusions, and warned against dilution of the doctrine of ambiguity by other than "genuine ambiguities." Id. at 246, 405 A.2d 788.
In short, Weedo interpreted the comprehensive general liability policy as one which "does not cover an accident of faulty workmanship but rather faulty workmanship which causes an *544 accident." Id. at 249, 405 A.2d 788. However, the Court also emphasized that, "[s]uch claims must nevertheless be otherwise cognizable under the general grant of coverage in the first instance in order to constitute a claim `to which this insurance applies.'" Id.
Justice Pashman dissented in Weedo, not because he disagreed with the Court's legal interpretation of the subject policies, but because he believed that the policies were ambiguous from the viewpoint of an average consumer of comprehensive general liability coverage. He preferred a construction in accordance with reasonable expectations of the average insured. Id. at 251, 405 A.2d 788. See also Uhock v. Sleitweiler, 13 Kan. App.2d 621, 778 P.2d 359 (1988) (which considered a claim by homeowners against an exterminator alleging liability for termite damage suffered after the home was treated).
In Uhock the Kansas Court construed exclusionary language that the coverage did not extend to "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof or out of materials, parts or equipment furnished in connection therewith," to exclude the termite damage. It concluded that the "work" referred to in the exclusion could only refer to the property treated by the exterminator. Citing Owings v. Gifford, 237 Kan. 89, 697 P.2d 865 (1985), the Court held that the exclusionary language was unambiguous and that provisions of a general liability policy provide coverage only if the insured's work or product actively malfunctions causing injury to an individual or damage to another's property. Thus the Kansas Court, in a more similar situation, appears to have adopted the Weedo approach that the comprehensive general liability coverage does not cover repair or replacement necessitated by improperly performed work. See also West v. McDonald, 103 N.J. Super. 201, 247 A.2d 20 (App.Div. 1967), aff'd, 52 N.J. 536, 247 A.2d 129 (1968) (emphasizing that special coverage is required for "products-completed operations hazard," but relegating the question of when operations were completed in the given situation to the jury).
*545 The question of completed operations coverage did not arise in recent comprehensive general liability coverage opinions such as Broadwell Realty Services, Inc. v. Fidelity & Cas. Co. of New York, 218 N.J. Super. 516, 528 A.2d 76 (App.Div. 1987) and CPS Chemical Co., Inc. v. Continental Ins. Co., 222 N.J. Super. 175, 536 A.2d 311 (App.Div. 1988). Such an issue was discussed and resolved, however, in American Policyholders Ins. Co. v. McClinton, 100 N.J. Super. 169, 241 A.2d 462 (Ch. Div. 1968). Compare McAllister v. Century Indemnity Co. of Hartford, 24 N.J. Super. 289, 94 A.2d 345 (App.Div. 1953), aff'd, 12 N.J. 395, 396, 97 A.2d 160 (1953) (Brennan, J., dissenting). See also Annotation, Liability Insurance, Completed Operations, 58 A.L.R.3d 12, and cases there cited.
In future pesticide application cases, in order to determine whether comprehensive general liability coverage is applicable, it would be appropriate to make a factual showing of the nature of the damages claimed and of when and how they assertedly occurred. Additionally, as reasonable expectations should be considered, it may be appropriate to explore factually what insurance was purchased, the circumstances surrounding procurement of the coverage, the extent to which the carrier or its agent may have been made aware that the policy was to be used to fulfill registration requirements with the Department of Environmental Protection, and any other evidence of the insured's understanding when it bought its policy.
NOTES
[1] Newark has interposed no objection in the appellate brief to Gottliebs' standing to sue to declare the extent of Apex coverage. A standing question was raised in the pleadings. Similar actions have been entertained in our courts. See, e.g., Eggerding v. Bicknell, 20 N.J. 106, 109, 118 A.2d 820 (1955).
[2] It has been conceded by Newark in pleadings and on appeal that the Gottliebs are entitled to coverage under their 1982 policy to the full extent of an occurrence in its policy period, subject to its $25,000 policy limit. We do not read the order of judgment to alter this conceded coverage. The judgment and this appeal treat only with the availability of coverage under the subsequent Newark policies.
[3] As the substantive issues remain the same, we need not concern ourselves with the procedural anomaly thus created, which has turned the previous respondents in this appeal into appellants, and vice versa.
[4] See Endnote.
[5] While not essential to our analysis, it must be observed that the Sandoz decision in 1983 and Lac D'Amiante decision in 1985 might well have prompted informed New Jersey insureds to reasonably construe a general liability form to provide coverage consistent with the continuous trigger theory.
[6] See, e.g., supra, 99 Harv.L.Rev. 1458, 1581.
[7] See, e.g., Lac D'Amiante, supra, at 1559.